**AGA AKTIEBOLAG, a corporation of Sweden, and AGA Corporation, a corporation of New Jersey, Plaintiffs,**

v.

**ABA OPTICAL CORPORATION, a corporation of New York, and Gerald Pincus, Defendants.**

No. 77 C 152.

United States District Court, E. D. New York.

Nov. 23, 1977.

Lerner, David, Littenberg & Samuel, Westfield, N. J., for plaintiffs, by Sidney David, Lawrence I. Lerner, Westfield, N. J.

Rein, Mound & Cotton, New York City, for defendants, by Seymour J. Ugelow, New York City.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This is an action for injunctive relief and damages based on plaintiffs' claims of trademark infringement and breach of fiduciary obligations by their former employee, defendant Pincus. Following extensive evidentiary hearings on plaintiffs' motion for a preliminary injunction, the parties agreed that sufficient evidence had been adduced to warrant final disposition of the action on the merits.

The defendant Pincus was employed by the plaintiffs from 1971 until December 31, 1976. His responsibility was to sell optical filters and coatings for AGA Corporation and try to build up business in the United States for the products of the AGA Innovation Division of the plaintiff AGA Aktiebolag, which Innovation Division subsequently became known as AGA Optical Division (hereinafter collectively referred to as "AGA"). As plaintiffs' lone salesman of optical filters and coatings in the United States, Pincus had developed a rare skill for retrofitting (refurbishing) optics in color television cameras. During 1971–1975, however, his selling efforts were carried on at considerable expense to AGA. It was not until 1976 that the market for this retrofitting service began to show a modest profit. Pincus', salary, which was based mainly on commissions, rose accordingly. At mid-year plaintiffs increased his base salary of $14,400 to $30,000 per annum but reduced his commission rate from 30% on all sales to 4% on sales over $250,000 for the year 1976. They also informed him that his 1977 compensation would be limited to $40,000. Pincus chafed under these earnings restrictions, and in late 1976 he decided to strike out on his own.

On October 22, 1976, while he was still in AGA's employ, Pincus incorporated ABA Optical Corporation ("ABA"). Since he was the AGA corporation's only expert in retrofitting color television cameras, he hoped to persuade AGA to sell him its optics inventory and continue to utilize his services as its independent agent. On November 1, 1976 he informed AGA of his incorporation of ABA Optical Corporation, his intention to leave its employ on December 31, 1976, and his proposal for the future agency relationship with AGA. Several discussions followed, but on December 30, 1976 AGA rejected Pincus' proposal and advised him to refrain from using the name "ABA Optical Corporation." Pincus' personal diary for that day records his response: "I told him to sue."

Meanwhile, unbeknownst to AGA, Pincus had embarked on a scheme to divert corporate opportunities to his newly-formed company to ensure that it would get off to a flying start. The most egregious example involves the Canadian Broadcasting Company ("CBC"). Between February and December 1976, Pincus communicated on numerous occasions with CBC officials in an effort to sell them 25 "retrofit kits" for their television cameras. As early as March 1976 CBC expressed interest in the kits. In September 1976 a CBC employee, Terrence Snazel, requested a demonstration of the retrofit optics, and Pincus subsequently set a tentative date in late October. When Pincus failed to confirm this date, Snazel was forced to postpone the demonstration. On December 10, 1976 Snazel again requested a demonstration. Pincus scheduled the demonstration for January 12, 1977 and explained that at that time he would be representing ABA Optical Corporation rather than AGA. On January 6, 1977 Pincus, on behalf of ABA, sold a retrofit kit to CBC and installed it on the demonstration date, January 12, 1977. On March 3, 1977 ABA sold an additional 21 retrofit kits to CBC for $42,800.

Throughout this flurry of activity Pincus failed to tell anyone at AGA about the scheduled demonstrations for CBC. He did not even mention the potential CBC order in a conversation on December 30, 1976, with Per Hansen, his Swedish counterpart who had been assigned to take his place in

this country. In addition, it is most significant that none of the written correspondence between Pincus and CBC was in the AGA files after Pincus' departure on December 31, 1976. The court must conclude that Pincus deliberately diverted the CBC order to ABA and attempted to cover up his wrongdoing by taking the CBC file with him when he left AGA.

Pincus contends that his actions in the CBC affair do not demonstrate disloyalty to AGA because, until December 30, 1976, he believed that ABA would be approved as AGA's agent. Perhaps things would have gone smoothly had AGA accepted Pincus' proposal to be its agent. The proposal, however, was rejected. Pincus' fault is that he continued to operate as though it had been accepted. In so doing, he violated his fiduciary obligations to AGA.

Another example of diversion of AGA's corporate opportunities involves Station KERA in Dallas, Texas. An "order backlog" list compiled by Pincus on August 30, 1976 contains an order from KERA for "3–400's." In a letter dated November 22, 1976 and addressed to Pincus at AGA's headquarters, Clyde Miller, Director of Technical Operations at KERA, requested that Pincus come as soon as possible to "update the optics in our three GE PE–400 Cameras." Miller sent the letter after several unsuccessful attempts to reach Pincus by telephone beginning in late August. The letter also failed to elicit a response from Pincus. In the latter part of December 1976 Pincus reported to AGA that the KERA order on the order backlog list was "dead." In a letter dated January 18, 1977, Miller explained to an AGA employee what happened next:

"I was contacted by Mr. Pincus on January 14, 1977. He offered to perform the service we need in behalf of another company. Since I had not been able to get a response from AGA, I agreed to place the order with him on a trial basis." PX–42.

Pincus testified that he did not receive the November 22, 1976 letter from Miller and that he did not report that the KERA order was "dead." Since the court had serious reservations about Pincus' credibility, in this instance it will not credit his testimony. The court finds that Pincus improperly diverted the KERA order from AGA to ABA and again attempted to cover up his wrongdoing.

In addition, Pincus violated his fiduciary obligations to AGA in several other respects. While he was devoting substantial amounts of time to furthering the interests of ABA during December 1976, he did not sell or install any new retrofit kits for AGA. He failed to maintain an adequate inventory of optics, and he did not cooperate with his replacement at AGA. Finally, soon after he left AGA, he filled an order which had been on AGA's order backlog list and attempted to take away other orders on the list.

Plaintiffs also have established their trademark infringement claim. On January 21, 1977, the day the complaint was filed, the court issued an order restraining defendants from employing the trade name or trademark "ABA" or "ABA Optical Corporation" pending a hearing on plaintiffs' motion for a preliminary injunction. Prior to the hearing, which was eventually adjourned to March 16, 1977, Pincus changed the name of his corporation from "ABA" to "T & G Optics, Inc." In so doing, Pincus was accepting the inevitable, for there is no question that "ABA" was likely to cause, and in fact did cause, confusion with "AGA," which is a trademark owned by AGA Aktiebolag.

The complaint contains additional claims of common law trademark infringement, violation of the prohibition in 15 U.S.C. § 1125 against "false designations of origin," and breach of contract. The first two add nothing to the federal trademark infringement claim accepted above. In the breach of contract claim plaintiffs assert that Pincus, in using AGA's customer list on behalf of ABA, violated his agreement to "keep secret all processes, inventions, devices, or other confidential information . . . made known to me while in the employ of AGA . . . ." PX–43. In construing this provision, the court applies

the *ejusdem generis* rule, which states that, where general words follow a series of specific words, the general words must be deemed applicable only to things in the same class as those specifically mentioned. In this case, AGA's customer list would not come within the meaning of "other confidential information," for it is completely unrelated to "processes, inventions, [and] devices." Therefore the breach of contract claim must be dismissed.

Following are the court's findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## FINDINGS OF FACT

### Parties

1. Plaintiff AGA Aktiebolag is a Swedish corporation having its principal place of business in Sweden.

2. Plaintiff AGA Corporation, a wholly-owned subsidiary of AGA Aktiebolag, is a New Jersey corporation having its principal place of business in New Jersey.

3. Defendant ABA Corporation was incorporated under the laws of the State of New York on October 22, 1976. Its principal place of business was 71–01 Ingram Street, Forest Hills, New York. Effective February 8, 1977, ABA Optical Corporation changed its name to T & G Optics, Inc.

4. Defendant Gerald Pincus is a citizen of the State of New York and resides at 71–01 Ingram Street, Forest Hills, New York.

### Amount in Controversy

5. The amount of damages sought by plaintiffs, plus the value of their business which they seek to protect by injunction, exceeds $10,000 exclusive of interest and costs.

### Breach of Fiduciary Obligations

6. From 1971 to December 31, 1976, Pincus, a skilled optical engineer, was employed by AGA Corporation to sell optical filters and coatings manufactured by the AGA Optical Division of AGA Aktiebolag. Although paid by AGA Corporation, he reported directly to the AGA Optical Division in Sweden.

7. During his employment by AGA, Pincus had sole responsibility for the management of the Thin Films Division of AGA Corporation. He alone controlled the purchasing, inventory control, selling and installation of the products of the AGA Optical Division throughout the United States and Canada.

8. Under a May 1973 agreement, Pincus received a salary of $1,200 per month plus a commission of 30% of sales. His total annual salary and commissions ranged from $28,000 in 1973 to $55,000 in 1976.

9. In 1974 Pincus began selling and installing retrofit kits for General Electric color television cameras. Prior to that time he was prohibited from installing optics in color television cameras because of a restrictive arrangement between his previous employer and AGA.

10. Sales of Pincus' Thin Film Division increased slowly until 1976, when they skyrocketed to $261,000, almost quadruple the figure for the previous year. Only in 1976 did the Thin Film Division show a profit.

11. Pincus' commissions rose correspondingly for the first part of 1976. However, on April 29, 1976, AGA served written notice upon Pincus of termination of his employment effective July 30, 1976. On July 8, 1976, Pincus agreed to a new employment agreement submitted to him by AGA. Under its terms, effective July 1, 1976 and terminating December 31, 1976, he would receive $30,000 per year, plus expenses and commissions of 4% on sales over $250,000. The agreement also stated that later in the year AGA would submit to Pincus his 1977 contract, under which his salary would be limited to $40,000.

12. During the course of 1976 Pincus undertook an extensive sales effort with respect to AGA's retrofit kits. He telephoned television stations throughout the United States and Canada in order to determine which ones used General Electric color television cameras, and the type and quanti-

ty of the cameras. Then he sent follow-up letters to about 150 stations which appeared to be prospective AGA customers. PX 30, 31. On March 18, 1976 Pincus sent to Roland Jacobsson, managing director of the AGA Optical Division in Sweden, a list of the 34 stations to which he had quoted prices for retrofit kits. He reported that there was a "50–50 certainty" that the stations would order the kits. PX 50. On August 30, 1976 he sent to Jacobsson an order backlog list of the 13 stations whose orders had not yet been filled. PX 9.

13. Distressed by the salary restrictions placed upon him in the July 8, 1976 agreement, Pincus decided in late 1976 to form his own company. Accordingly, on October 22, 1976, while he was still AGA's employee, Pincus incorporated ABA Optical Corporation. He hoped to persuade AGA to sell him its optics inventory and continue to utilize his services as its independent agent in the United States and Canada. On November 1, 1976 he travelled to Sweden and discussed his plans with Jacobsson. At that time he informed Jacobsson that he had incorporated ABA, he intended to leave AGA's employ on December 31, 1976, and he hoped to continue as AGA's agent. Upon his return to the United States, Pincus held several discussions with AGA officials concerning his plans, and he transmitted a written proposal to AGA on December 13, 1976. On December 30, 1976 AGA rejected Pincus' proposal and advised him to refrain from using the name "ABA Optical Corporation." Pincus refused.

14. Between February and December 1976 Pincus communicated on numerous occasions with Canadian Broadcasting Company officials in an effort to sell them 25 retrofit kits for their television cameras. In March 1976 CBC expressed interest in the kits. In September 1976 a CBC employee, Terrence Snazel, requested a demonstration of the retrofit optics, and Pincus subsequently set a tentative date in late October. When Pincus failed to confirm this date, Snazel was forced to postpone the demonstration. On December 10, 1976 Snazel again requested a demonstration. Pincus scheduled the demonstration for January 12, 1977 and explained that at that time he would be representing ABA rather than AGA. On January 6, 1977, on behalf of ABA, Pincus sold a retrofit kit to CBC and installed it on the demonstration date, January 12, 1977. On March 3, 1977 ABA sold an additional 21 retrofit kits to CBC for $42,800. Throughout this period Pincus failed to tell anyone at AGA about the scheduled demonstrations for CBC. He did not even mention the potential CBC order in a conversation on December 30, 1976 with Per Hansen, his Swedish counterpart who had been assigned to take his place in this country. None of the written correspondence between Pincus and CBC was in the AGA files after Pincus' departure on December 31, 1976. The court finds that Pincus deliberately diverted the CBC order to ABA and attempted to cover up his wrongdoing by taking the CBC file with him when he left AGA.

15. The order backlog list compiled by Pincus on August 30, 1976 contains an order from Station KERA of Dallas, Texas, for "3–400's." On November 22, 1976 Clyde Miller, Director of Technical Operations at KERA, sent a written request to Pincus to come as soon as possible to "update the optics in our three GE PE–400 Cameras." Pincus failed to respond to the letter, as he had failed to respond to earlier telephone calls from Miller. In the latter part of December 1976 Pincus reported to AGA that the KERA order on the order backlog list was "dead." On January 14, 1977 Pincus contacted Miller and offered to retrofit his cameras on behalf of ABA. Miller placed the order with Pincus because he "had not been able to get a response from AGA." The court finds that Pincus improperly diverted the KERA order to ABA and again attempted to cover up his wrongdoing.

16. Pincus spent substantial amounts of time in December 1976 furthering the interests of ABA. He arranged for the demonstration for CBC, placed orders for materials and office supplies, made deposits into ABA's account, paid a bill, ordered a telephone and borrowed a typewriter for his work for ABA.

17. During the same month he made no new sales or installations of television retrofit kits for AGA, and he failed to maintain an adequate inventory of optics. In addition, he obstructed the transfer of his duties to Hansen. He inadequately responded to Hansen's inquiries concerning inventory, new orders, and backlog orders, and he failed to provide Hansen with the tools required to retrofit television cameras.

18. After leaving AGA, Pincus not only took away the CBC and KERA orders, but also obtained a $4,800 order from Station KPRC which had appeared on AGA's order backlog list and attempted to gain an additional $11,400 KPRC order which had also been on the order backlog list.

19. In early 1977 Pincus also sent letters on behalf of ABA to some 96 television stations, 60 of which Pincus had previously solicited for AGA. Two were on AGA's order backlog list. The court finds that Pincus deliberately solicited those two stations from AGA's order backlog list, which he had generated at AGA's expense.

*Trademark Infringement*

20. AGA Aktiebolag is the owner of Federal Trademark Registration No. 694,-852 issued March 22, 1960, for the trademark "AGA" as applied to goods including radio and television equipment and Federal Trademark Registration No. 711,821 issued February 28, 1961, for the trademark "AGA" as applied to goods including lenses, objectives, prisms; optical viewing and measuring apparatus; and cameras for industrial purposes. These registrations are valid.

21. Since 1971 AGA Corporation used "AGA" in connection with its sale and distribution in the United States of the various optics products supplied by AGA Aktiebolag. Television stations have come to associate "AGA" with AGA's retrofit kits.

22. Soon after ABA was incorporated on October 22, 1976, Pincus, the president and sole stockholder of ABA, began employing the name "ABA" in commerce in connection with the sale and installation of filters, coated optics and retrofit kits for General Electric television cameras. On December 17, 1976, Pincus ordered letterheads, envelopes, invoices, business cards and shipping labels to use in connection with ABA's business. When ordering these materials, Pincus gave the printer copies of the AGA invoice, his AGA business card, AGA envelopes and AGA stationery, and he told the printer to "make me up similar ones." In accordance with Pincus' instructions, the printer printed invoices, business cards, envelopes and stationery, all virtually identical to the corresponding materials of AGA, with the exception that Pincus used the letter "B" in "ABA" where plaintiffs used the letter "G" in "AGA."

23. Pincus continued to employ the name "ABA" even after the president of AGA Corporation told him on December 30, 1976 to refrain from using it. Pincus also ignored letters dated January 5 and January 17, 1977, in which AGA asserted its rights in its trademark. Pincus discontinued use of the name "ABA" only when restrained by the court on January 21, 1977.

24. The court finds that defendants' use of the names "ABA" and "ABA Optical" in connection with the sale and offer for sale of defendants' products and services is likely to cause confusion with respect to the similar products and services offered by plaintiffs under the registered trademark and common law trademark "AGA." The court further finds that defendants' use of the names "ABA" and "ABA Optical" actually caused confusion. On one occasion a shipment of twenty mirrors was intended for AGA but was mistakenly shipped to ABA. In addition, a CBC official testified that the closeness of ABA to AGA "was rather confusing to us." Even at trial the similarity of names confused the court, counsel, the witnesses and the court reporter.

*Remaining Claims*

25. In connection with the sale of filters, coatings and retrofit kits for General Electric television cameras, plaintiffs employed the trademark "AGA" throughout the Unit-

ed States and Canada to indicate the source and origin of their goods and services, and the customers of AGA have come to identify plaintiffs as the source of the goods and services bearing the trademark "AGA." By using the confusingly similar name "ABA" on similar goods and services, defendants have used a false designation of origin and have caused such goods and services to enter into commerce with knowledge of such falsity of origin.

26. In his employment contract with AGA, Pincus agreed to keep secret, both during his employment and after its termination, "all processes, inventions, devices, or other confidential information . . . made known to me while in the employ of AGA . . . ." The court finds no violation of this agreement by Pincus.

### Injury to Plaintiffs

27. As a result of defendants' acts detailed above, plaintiffs have lost business to defendants and have been placed at a serious competitive disadvantage. Defendants' acts have caused and continue to cause substantial and irreparable harm to plaintiffs and, unless restrained, will aggravate the harm in the future.

## CONCLUSIONS OF LAW

1. The court has personal jurisdiction over the parties and has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1338, and 15 U.S.C. § 1121.

2. Pincus owed a fiduciary duty to his employer and was prohibited while employed from acting in any manner inconsistent with the agency or trust relationship. He was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. *Duane Jones v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954).

3. Generally an employee may compete with his former employer as to matters for which he has been employed. Restatement of Agency 2d § 393 Comment e. He is not free, however, to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty

during his employment and before resignation and by the breach of his obligation to use his best efforts in the interest of his employer. *State Export Co. v. Mol Shipping and Trading, Inc.,* 155 N.Y.S.2d 188 (Sup.Ct.N.Y.Co.1956). See also *United Board & Carton Corp. v. Britting,* 63 N.J. Super. 517, 164 A.2d 824 (1959), aff'd, 61 N.J.Super. 340, 160 A.2d 660 (1960). By soliciting customers for ABA before the end of his employment with AGA and by hindering the continuation of AGA's business, Pincus violated his fiduciary obligations to plaintiffs.

4. The general rule is that, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach and courts will not enjoin the former employee from soliciting his previous employer's customers. *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 328 N.Y. S.2d 423, 278 N.E.2d 636 (1972). Customer lists are protected, on the other hand, where the customers are not known in the trade or are discoverable only by extraordinary efforts or where an employee appropriates the list by copying or studied memory. *Id.* Under these guidelines, plaintiffs' customer lists, aside from the order backlog list, do not merit protection, since they are merely lists of *prospective* customers rather than actual customers. Moreover, although plaintiffs did expend time and money to winnow out customers most likely to order retrofit kits, the customers solicited are openly engaged in business and their names and addresses are readily available in the *Broadcasting Yearbook,* a public directory of television stations. Trade secret protection does not therefore attach except as hereinafter specified.

5. With respect to the order backlog list, the court will afford protection to AGA. This was truly a confidential list, containing specific orders which AGA had not yet filled. In fact, Pincus' dilatory tactics toward the end of his employment with AGA helped to ensure that these orders

would remain unfilled until Pincus started his ABA operations. By pirating away the KERA and KPRC orders which had appeared on the order backlog list, Pincus committed an egregious breach of trust and confidence.

6. AGA Aktiebolag has the exclusive right to the use of the trademark "AGA" in commerce in connection with radio and television equipment, lenses, objectives, prisms, optical viewing and measuring apparatus, and cameras for industrial purposes by reason of its ownership of U.S. Trademark Registrations 694,852 and 711,821. It also has valid common law trade name and trademark rights in the trade names and trademarks "AGA" and "AGA Optical" throughout the United States in connection with the sale, installation and servicing of optical products including filters, prisms, beam splitters, optical coatings, mirrors and retrofit kits for color television cameras.

7. Defendants have infringed plaintiffs' rights in their United States Trademark Registrations and their common law trade names and trademarks by their use in commerce of the trade names and trademarks "ABA" and "ABA Optical." Defendants have violated 15 U.S.C. § 1125(a) by using, in connection with their goods and services, a false designation of origin and by causing such goods and services to enter into commerce with knowledge of such falsity of origin.

8. As compensation for Pincus' soliciting customers for ABA before the end of his employment with AGA, for hindering the continuation of AGA's business, for pirating away orders from AGA's order backlog list, and for infringing plaintiffs' trademarks, plaintiffs are entitled to recover the resulting damages or defendants' profits, whichever are greater, together with the costs of this action. Counsel for the parties will confer with the Court regarding a date for a hearing with respect to the ascertainment of damages and costs.

9. Plaintiffs also are granted an injunction restraining defendants for a period of two years from filling or soliciting any order from a customer on plaintiffs' order backlog list. In addition, defendants are permanently enjoined from using the trade names and trademarks "ABA" and "ABA Optical."

SO ORDERED.