**JET COURIER SERVICE, INC., an Ohio corporation, Petitioner,**

v.

**Anthony MULEI and American Check Transport, Inc., Respondents.**

No. 87SC182.

Supreme Court of Colorado, En Banc.

March 20, 1989.

---

McMichael, Benedict & Multz, Mitchell Benedict II, Denver, for petitioner.

Joseph M. Fanganello, P.C., Joseph M. Fanganello, Denver, for respondent, Anthony Mulei.

Cordova, Harris & Mellon, P.C., Donald E. Cordova, and John S.L. Sackett, Denver, for respondent American Check Transport, Inc.

LOHR, Justice.

In *Mulei v. Jet Courier Service, Inc.*, 739 P.2d 889 (Colo.App.1987), the Colorado Court of Appeals affirmed the trial court's decision that the respondent, Anthony Mulei, did not breach any duty of loyalty to his employer, Jet Courier Service, Inc. (Jet), when he organized another company, American Check Transport, Inc. (ACT), to compete with Jet in the air courier business. The court of appeals also affirmed the trial court's award of unpaid compensation due Mulei under his employment contract with Jet, plus a fifty-percent statutory penalty pursuant to section 8–4–104(3), 3B C.R.S. (1986). Finally, the court of appeals agreed with the trial court that as a matter of law, neither Mulei nor ACT engaged in a civil conspiracy to harm Jet's business interests. We granted Jet's petition for certiorari to review the court of appeals' resolution of these issues. We now conclude that the court of appeals and the trial court applied unduly narrow legal standards in determining what actions constitute a breach of an employee's duty of loyalty to his employer. Accordingly, we reverse the judgment of the court of appeals with respect to the issues upon which we granted review.[1] Because the trial court's findings of fact are insufficient to determine whether Mulei breached his duty of loyalty, we remand the case for retrial[2]

---

1. The judgment of the court of appeals remains in effect as to issues not reviewed in this certiorari proceeding. See note 9, below.

2. The trial judge is no longer serving on the district court. Therefore, retrial will be necessary rather than new findings and conclusions based on the evidence presented at the original trial.

consistent with the standards announced in this opinion.

## I.

Although we remand this case for retrial, an understanding of the issues presented requires a familiarity with the background of this litigation. We obtain our description of the facts from the findings of the trial court, supplemented by other facts derived from undisputed evidence in the record. However, this description of the facts is not binding upon the trial court on remand.

Jet is an air courier company engaged principally in supplying a specialized transportation service to customer banks.[3] Jet provides air and incidental ground courier service to carry canceled checks between banks to facilitate rapid processing of those checks through the banking system. Shortened processing time enables the banks at which the checks are cashed to make use of the funds sooner. Because the sums involved are large, substantial amounts of daily interest are at stake. As a result, the ability to assure speedy deliveries is essential to compete effectively in the air courier business.

In 1981 Jet was an established family-owned corporation headed by Donald W. Wright. The principal offices of the corporation were in Cincinnati, Ohio. Jet had no office in Denver. Anthony Mulei at that time was working in Denver for another air courier service in a management capacity. Mulei had worked in the air courier business for a number of years and was very familiar with it. He had numerous business connections in the banking industry in Denver and other cities. On February 18, 1981, Wright and Mulei agreed that Mulei would come to work for Jet and would open a Denver office and manage Jet's Western Zone operations from that office. They orally agreed that Mulei would be vice president and general manager for the Western Zone and would have autonomy in matters such as the solicitation of business, the operation of the business, and personnel policies. The parties further agreed that Mulei would be paid $36,000 per year, plus a bonus of ten percent of the net profits of the Western Zone, to be calculated and paid every three months. Based in part on Mulei's business relationships with several regional banks, Wright and Mulei expected that Mulei would be able to expand Jet's business.

Late in 1981 Wright sent Mulei a written employment agreement containing the same terms as the oral agreement with the addition of a noncompetition covenant whereby Mulei would agree not to compete with Jet for two years after termination of his employment, without any geographic restriction. Mulei signed the written agreement. At some time before this litigation commenced, Wright also signed the agreement on behalf of Jet.

Mulei performed services as agreed and was successful in significantly increasing the business of Jet in the Western Zone as well as other areas of the United States. Although Jet regularly paid Mulei his monthly salary, and paid him additional sums from time to time totaling $31,000 over the period of his employment, Jet never computed or paid the quarterly bonuses in the manner contemplated by the contract. From time to time Mulei requested payments and accountings but was not successful in obtaining them.

Mulei became progressively dissatisfied with his inability to resolve the bonus issue and with what he believed to be intrusions into his promised areas of autonomy in personnel and operational matters. Toward the end of 1982 he began to look for other work in the air courier field and sought legal advice concerning the validity of the noncompetition covenant in his employment contract.

In the course of seeking other employment opportunities and while still employed by Jet, Mulei began to investigate setting up another air courier company that would compete with Jet in the air courier business. In January 1983, Mulei spoke with

---

**3.** Jet also transports small items of freight, consisting of documents and parcels that require very prompt delivery, but this is not a major component of its business.

John Towner, a Kansas air charter operator who was in the business of supplying certain air transportation services, about going into business together. In February 1983, Mulei met with Towner and two Jet employees to discuss setting up this new business and obtaining customers.

On February 27, 1983, Mulei, while still employed by Jet and on Jet business in Phoenix, talked to two of Jet's customer banks to inform them he would be leaving Jet in mid-March and to tell them he "would try to give them the same service." He engaged in similar discussions with two bank customers of Jet in Dallas while still employed by Jet. Early in March 1983, Mulei met with representatives of three of Jet's Denver customers, First Interstate Bank of Denver, Central Bank of Denver, and United Bank of Denver, and discussed the new air courier company that Mulei and Towner were forming. Mulei told the United Bank of Denver float manager that "if they wished to give us [ACT] the business," then ACT would be able to serve them without any break in the service, and that ACT would be able to take over their business and fully satisfy their air courier service needs. Mulei further told United Bank of Denver that "by minimizing expenses, I would be in a position, sometime later, to reduce cost." Mulei had similar conversations with representatives of First Interstate Bank of Denver.

Prior to the termination of Mulei's employment by Jet on March 10, 1983, Mulei met with nine pilots who were flying for Jet to discuss his formation of ACT. Before his termination, Mulei also met with Jet's Denver office staff and with its ground couriers [4] to discuss potential future employment with ACT.[5] Mulei offered Jet's office staff better working conditions, including health and dental insurance and part ownership of ACT, if they were to join ACT. Mulei did not inform Wright of any of these activities with respect to Jet customers, contractors or employees.

ACT was incorporated on February 28, 1983. Mulei was elected president at the first shareholders meeting. On behalf of Jet, Wright fired Mulei on March 10, 1983, when Wright first learned of Mulei's organization of a competing enterprise. On that same day Mulei caused ACT to become operational and compete with Jet.[6] Five Denver banks that had been Jet customers became ACT customers at that time. Additionally, when Mulei was fired, three of the four other employees in Jet's Denver office also left Jet and joined ACT. All of Jet's ground carriers in Denver immediately left Jet and joined ACT. All nine of Jet's pilots in Denver either quit or were fired. Jet was able to maintain its Denver operations only through a rapid and massive transfer of resources, including chartered aircraft

4. The trial court's findings indicate that it considered the Jet pilots and ground couriers to be independent contractors and not employees of Jet. However, the trial court did not focus on this distinction in reaching its conclusion. The court of appeals also did not discuss any employee/independent contractor distinction; it simply referred to all these personnel as "Jet's employees." *Mulei,* 739 P.2d at 891. We agree that any distinction as to whether the personnel, other than Mulei, engaged in Jet's air courier operations were employees or independent contractors is not pertinent to the disposition of the issues presented by this case. The record indicates that the Jet pilots and ground couriers were an integral and necessary part of Jet's operation. Therefore, the various personnel are simply referred to as "employees" for purposes of this opinion.

5. Although it is not entirely clear from the court of appeals' opinion that Mulei discussed his new

air courier business with Jet's customers and employees before Mulei was fired by Jet, this fact is established by the trial court's findings and fully corroborated and elaborated upon by Mulei's own testimony.

6. Mulei had intended to make ACT operational on March 14 at the beginning of a business week. Mulei advanced the date to March 10 when Wright "prematurely" learned of Mulei's activities in setting up a competing business and discharged him from his employment with Jet. Activity on March 10 was frenzied. Mulei ran ACT from a Denver hotel room and attempted to obtain the business of Jet's bank customers and to assure them that ACT could provide uninterrupted quality service. At the same time, Wright brought in personnel from Cincinnati and other cities and attempted to keep the Denver office operational and to persuade Jet's customers to continue to obtain air courier service from Jet.

and ground couriers, from Jet's other offices.

Mulei filed suit against Jet in Denver District Court on March 10, 1983, the same day he was fired, seeking principally to recover unpaid compensation and penalties on such unpaid amounts pursuant to section 8–4–104, 3B C.R.S. (1986), and further seeking a declaratory judgment that the noncompetition covenant in his employment contract was void. Jet counterclaimed for breach of contract, breach of fiduciary duty, and civil conspiracy and sought damages and other relief.[7] Jet also filed a separate suit in Denver District Court against ACT, Towner, and Towner's air charter company, alleging a civil conspiracy among Towner, Mulei, ACT, Towner's air charter company, and others to harm Jet's business interests and seeking damages and injunctive relief.

The two cases were consolidated for trial. The district court concluded that Mulei's noncompetition covenant was void for lack of consideration and unreasonableness, that Mulei was entitled to salary and bonus compensation totaling $93,740.34 plus a fifty-percent statutory penalty of $46,870.17 pursuant to section 8–4–104, as well as vacation pay, attorney fees in connection with the compensation and penalty claims, interest, and costs. The district court also concluded that Mulei did not violate his duty of loyalty to Jet. Accordingly, the district court dismissed Jet's counterclaims against Mulei for damages, and it denied Jet's civil conspiracy claim for damages and injunctive relief against ACT.[8] The court of appeals affirmed the district court's judgment. *Mulei v. Jet*, 739 P.2d 889 (Colo.App.1987).

We granted certiorari to review the decision of the court of appeals on three issues: (1) whether the district court erred in concluding that Mulei did not violate a duty of loyalty to Jet, (2) whether any breach by Mulei of a duty of loyalty he owed Jet prevents Mulei from obtaining full recovery of the salary, bonus, and statutory penalty otherwise due him, and (3) whether the district court erred in dismissing Jet's civil conspiracy claims against Mulei and ACT.[9]

## II.

The court of appeals affirmed the trial court's conclusion that Mulei did not breach his duty of loyalty to Jet by his activities prior to the time he was fired by Jet. Specifically, the court of appeals concluded that Mulei did not breach his duty of loyalty either by meeting with Jet's customers to discuss ACT's future operating plans or by meeting with Jet's employees to discuss future employment opportunities with ACT. We conclude that the court of appeals applied improper legal standards in reviewing the trial court's conclusions as to what actions constitute a breach of an employee's duty of loyalty to his employer.

Whether an employee's actions in preparation for competing with his employer constitute a breach of the employee's duty of loyalty is an issue of first impression for this court. We derive guidance in determining the nature of an employee's duty of loyalty from the Restatement (Second) of Agency and from the decisions of other jurisdictions applying the standards found in the Restatement.

7. Jet also sought to enjoin Mulei from unlawfully competing with Jet, but this request for relief was predicated solely on Mulei's noncompetition covenant which the trial court ultimately ruled invalid, a ruling not at issue on appellate review.

8. Towner and Towner's air charter company reached a compromise settlement with Jet and were dismissed as parties to Jet's civil conspiracy suit.

9. Originally, we did not grant certiorari on the conspiracy issue, but we implicitly agreed to

consider it by orders issued during the briefing period. We did not grant certiorari to review the trial court's holding that the noncompetition covenant was invalid, the court of appeals' holding that Mulei did not breach his employment contract by failing to devote his full time and best efforts to Jet's business or by disclosing confidential information, the court of appeals' holding that Mulei did not engage in tortious interference with Jet's contractual relations, or the court of appeals' determination that the trial court did not err in quantifying Mulei's bonus.

■ Section 387 of the Restatement (Second) of Agency provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Rest. (2d) Agency § 387 (1957). Other courts have applied the Restatement's agency principles to define an employee's duty of loyalty to his employer.[10] See, e.g., AGA Aktiebolag v. ABA Optical Corp., 441 F.Supp. 747, 754 (E.D.N.Y.1977) (employee owes fiduciary duty to employer and is prohibited from acting in any manner inconsistent with the agency during his employment; employee is bound at all times during employment to exercise the utmost good faith and loyalty in the performance of his duties); Las Luminarias of New Mexico Council of the Blind v. Isengard, 92 N.M. 297, 587 P.2d 444, 449 (App.1978) (employment relationship is one of trust and confidence; employee has duty to use best efforts on behalf of employer); see also Bancroft–Whitney Co. v. Glen, 64 Cal.2d 327, 49 Cal.Rptr. 825, 839, 411 P.2d 921, 935 (1966) (mere preparations to compete before termination of employment are not sufficient to constitute breach of duty of loyalty); New World Fashions, Inc. v. Lieberman, 429 So.2d 1276, 1277 (Fla.App. 1983) (employee may not compete with employer's business prior to termination of employment relationship); Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc., 384 So.2d 303, 308 (Fla.App.1980) (during course of employment relationship common-law duty prevents employee from engaging in disloyal acts in anticipation of future competition with employer); Maryland Metals, Inc. v. Metzner, 282 Md. 31, 382 A.2d 564, 568 (1978) (duty of employee to act solely for the benefit of employer in all matters within the scope of employment); Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 449 N.E.2d 320, 326 (1983) (employee occupying position of trust and confidence is bound to act for employer's benefit in all matters within scope of his employment). Underlying the duty of loyalty arising out of the employment relationship is the policy consideration that commercial competition must be conducted through honesty and fair dealing. "Fairness dictates that an employee not be permitted to exploit the trust of his employer so as to obtain an unfair advantage in competing with the employer in a matter concerning the latter's business." Maryland Metals, 382 A.2d at 568.

■ Thus, one facet of the duty of loyalty is an agent's "duty not to compete with

---

**10.** The Restatement (Second) of Agency § 387 comment b states that an agent's "duties of loyalty to the interests of his principal are the same as those of a trustee to his beneficiaries." Furthermore, some cases from other jurisdictions, as well as the court of appeals' opinion in this case, characterize the duty of loyalty an employee owes to his or her employer as a "fiduciary" duty or a "fiduciary" duty of loyalty. See, e.g., AGA Aktiebolag v. ABA Optical Corp., 441 F.Supp. 747, 754 (E.D.N.Y.1977); Mulei v. Jet, 739 P.2d 889, 893 (Colo.App.1987); Maryland Metals, Inc. v. Metzner, 282 Md. 31, 382 A.2d 564, 569 (1978). In their pleadings and briefs, the parties in this case have also characterized the duty of loyalty as a "fiduciary" duty. For the purposes of this opinion, however, we need not attempt to delineate the precise scope of an employee's duty of loyalty as applied to all factual situations. Neither must we determine whether the Restatement's trustee-beneficiary analogy is fully applicable to employer-employee relations. Accordingly, we choose to describe the duty at issue here simply as a "duty of loyalty" arising out of the employer-employee relationship.

Additionally, we need not determine whether the duty of loyalty discussed in this opinion applies in all its rigor to every employment relationship regardless of the nature of the work performed by the employee. Because an employee's duty of loyalty is based in part on agency law, some cases suggest that the higher standard of the duty of loyalty may only be appropriate where an employee has sufficient authority to act for the employer or access to confidential information to make apt the principal/agent analogy. See Bancroft–Whitney Co. v. Glen, 64 Cal.2d 327, 49 Cal.Rptr. 825, 838–39, 411 P.2d 921, 934–35 (1966) (duty of loyalty applies to corporate officer); Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 449 N.E.2d 320, 326 (1983) (duty of loyalty applies to "corporate officer, director, or trusted agent or employee"); Maryland Metals, Inc. v. Metzner, 282 Md. 31, 382 A.2d 564, 568 (1978) (duty of loyalty applies to "corporate officer or other high-echelon employee"). In any event, we need not determine the full scope of applicability of the duty of loyalty here since this duty is clearly applicable to Mulei because his position was one of sufficient authority that the principal/agent analogy is apt beyond question.

the principal concerning the subject matter of his agency." Rest. (2d) Agency § 393. A limiting consideration in delineating the scope of an agent's duty not to compete is society's interest in fostering free and vigorous economic competition. In attempting to accommodate the competing policy considerations of honesty and fair dealing on the one hand and free and vigorous economic competition on the other, courts have recognized "a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty." *Maryland Metals*, 382 A.2d at 569. Previous decisions have acknowledged that "the line separating mere preparation from active competition may be difficult to discern in some cases." *Id.*, 382 A.2d at 569 n. 3. Thus, "[i]t is the nature of [the employee's] preparations which is significant" in determining whether a breach has occurred. *Bancroft–Whitney Co. v. Glen*, 49 Cal.Rptr. at 839, 411 P.2d at 935.

Given the employee's duty of loyalty to and duty not to compete with his employer and the employee's corresponding privilege to make preparations to compete after termination of his employment, the issue here is whether Mulei's pre-termination meetings with Jet's customers and his co-employees to discuss ACT's future operations constituted violations of his duty of loyalty or whether these meetings were merely legally permissible preparations to compete.

### A.

We first apply the principles outlined above to determine whether the court of appeals erred in concluding that Mulei's meetings with Jet's customers did not breach Mulei's duty of loyalty. The commentary to section 393 of the Restatement (Second) of Agency notes that in the absence of a contrary agreement, an employee may compete with his employer after the termination of his employment. However, an employee is not "entitled to solicit customers for [a] rival business before the end of his employment." Rest. (2d) Agency § 393 comment e. Several courts have also stated the rule that pre-termination solicitation of customers for a new rival business violates an employee's duty of loyalty. *AGA Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754 (E.D.N.Y.1977) (by soliciting customers for rival business prior to end of his employment, employee violated his fiduciary obligations to employer); *Fish v. Adams*, 401 So.2d 843, 845 (Fla.App.1981) (employee may not engage in disloyal acts in anticipation of future competition such as soliciting customers prior to end of her employment); *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 569 (1978) (it is breach of duty of loyalty to solicit employer's customers prior to cessation of employment); *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn.App.1987) (employee's duty of loyalty prohibits her from soliciting employer's customers for herself while she is employed); *Las Luminarias of New Mexico Council of the Blind v. Isengard*, 92 N.M. 297, 587 P.2d 444, 449 (App.1978) (employee may not solicit customers before end of his employment).

■■■ The court of appeals affirmed the trial court's holding that Mulei's pre-termination meetings with customers did not violate a duty of loyalty since ACT did not become operational and commence competing with Jet until after Mulei left Jet's employ. *Mulei*, 739 P.2d at 893. This reasoning fails to accord adequate scope to the duty of loyalty outlined in the Restatement and the cases cited above. While still employed by Jet, Mulei was subject to a duty of loyalty to act solely for the benefit of Jet in all matters connected with his employment. Rest. (2d) Agency § 387. Jet was entitled to receive Mulei's undivided loyalty. *Fowler v. Varian Associates, Inc.*, 196 Cal.App.3d 34, 241 Cal.Rptr. 539, 543 (1987). The fact that ACT did not commence operations and begin competing with Jet until after Mulei's departure from Jet is not dispositive. Instead, the key inquiry is whether Mulei's meetings amounted to solicitation, which would be a breach of his duty of loyalty. Generally,

under his privilege to make preparations to compete after the termination of his employment, an employee may advise current customers that he will be leaving his current employment. *See Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 569 n. 3 (1978); *Crane Co. v. Dahle,* 576 P.2d 870, 872–73 (Utah 1978); *cf. Community Counselling Service, Inc. v. Reilly,* 317 F.2d 239, 244 (4th Cir.1963) (during period of employment, employee cannot solicit for himself future business which his employment requires him to solicit for his employer; "[i]f prospective customers undertake the opening of negotiations *which the employee could not initiate,* he must decline to participate in them") (emphasis added); *Rehabilitation Specialists, Inc. v. Koering,* 404 N.W.2d 301, 305 (Minn.App. 1987) (reversing summary judgment for employee and remanding for determination of whether employee's pre-termination contacts with employer's customers amounted to impermissible solicitation). However, any pre-termination solicitation of those customers for a new competing business violates an employee's duty of loyalty. Rest. (2d) Agency § 393 comment e. Accordingly, we conclude that the court of appeals and the trial court applied an unduly narrow legal standard in holding that Mulei's pre-termination customer meetings were not a breach of Mulei's duty of loyalty simply because ACT did not commence competing with Jet until after Mulei had been discharged.

We further conclude that a retrial will be necessary to determine whether Mulei violated his duty of loyalty to Jet by his conversations with some of Jet's customers before he was discharged. The trial court concluded that Mulei did not violate a duty of loyalty to Jet. In its findings of fact, the trial court stated that

> ACT was able, through the solicitation of [Mulei] before and after termination, to acquire business of certain banks, some of which had agreements with Jet.

Based on these findings and the record before us, we are unable to determine whether Mulei's pre-termination meetings with Jet's customers amounted to impermissible solicitation or were merely allowable preparations for competition. We cannot determine, for instance, whether Mulei specifically solicited Jet's customers before he was fired by Jet. The trial court's findings note only that "some" of the "certain banks" that Mulei met with either before or after his termination had agreements with Jet. Mulei's testimony suggests that prior to his termination he met with several customers of Jet to discuss obtaining future business for ACT. However, whether an employee's actions constitute a breach of his duty of loyalty involves a question of fact to be determined by the trial court in the first instance based on a consideration of all the circumstances of the case. *See Rehabilitation Specialists, Inc. v. Koering,* 404 N.W.2d 301, 305 (Minn.App.1987). Accordingly, this case must be returned to the trial court for retrial to determine whether under the standards governing an employee's duty of loyalty set forth in this opinion, Mulei's pre-termination meetings with Jet's customers amounted to impermissible solicitation in violation of his duty of loyalty to Jet.

### B.

We next consider whether the court of appeals erred in concluding that Mulei's meetings with Jet employees did not breach his duty of loyalty. An employee's duty of loyalty applies to the solicitation of co-employees, as well as to the solicitation of customers, during the time the soliciting employee works for his employer. Generally, an employee breaches his duty of loyalty if prior to the termination of his own employment, he solicits his co-employees to join him in his new competing enterprise. *Fish v. Adams,* 401 So.2d 843, 845 (Fla.App.1981) (employee may not solicit other employees prior to end of her employment); *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.,* 384 So.2d 303, 308 (Fla.App.1980) (employees breached their duty of loyalty by pre-termination solicitation of co-employees); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.,* 62 Ill.App.3d 671, 20 Ill.Dec. 160, 169, 379 N.E.2d 1228, 1237 (1978) (dur-

ing period of employment, employee cannot entice co-workers away from his employer); *Porth v. Iowa Department of Job Service*, 372 N.W.2d 269, 273 (Iowa 1985) ("employee who solicits fellow employees to leave their employer in favor of a competitor breaches the duty of loyalty owed by an employee to his or her employer"); *see Bancroft Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 840–41, 411 P.2d 921, 936–37 (1966) (breach of duty of loyalty found based in part on a consistent course of conduct by employee to obtain for competing business those of his co-workers whom the competitor could afford to employ and would find useful); Rest. (2d) Agency § 393 comment e (discussing limits of proper conduct with regard to securing the services of co-workers for a competing business); Annotation, *Liability for Inducing Employee Not Engaged for Definite Term to Move to Competitor*, 24 A.L.R.3d 821, 841–46 (1969 & 1988 Supp.) (annotating cases holding that employee who induces co-workers to leave their employer for a competitor is liable for breach of fiduciary duty).

In the case now before us, the court of appeals affirmed the trial court's conclusion that Mulei did not breach his duty of loyalty by meeting with other Jet employees prior to the termination of his own employment with Jet. *Mulei v. Jet*, 739 P.2d at 893. In concluding that there was no breach of Mulei's duty of loyalty, the court of appeals relied on its previous decision in *Electrolux Corp. v. Lawson*, 654 P.2d 340 (Colo.App.1982). The court of appeals cited *Electrolux* for the proposition that an employee will not be liable for a breach of his duty of loyalty unless he causes co-employees to breach a contract. We disagree with this proposition, and we again conclude that the court of appeals and the trial court applied an unduly restrictive legal standard in determining

whether Mulei's pre-termination discussions with co-employees breached his duty of loyalty.

In *Electrolux*, an Electrolux branch manager solicited a number of his co-workers to join him in a new distributorship he was opening. Six of the co-workers then left Electrolux to join the new firm. The court of appeals read the Restatement (Second) of Agency § 393 comment e as imposing liability for breach of an employee's duty not to compete only when "he causes his fellow employees to breach a contract." 654 P.2d at 341. Because the Electrolux workers' employment contracts were terminable at will, their resignations did not constitute a breach of their employment contracts. Thus, reasoned the court of appeals, since there was no breach of any employment contracts there was no breach of the manager's duty not to compete. *Id.*

Comment e to section 393 of the Restatement notes that the "limits of proper conduct with reference to securing the services of fellow employees are not well marked." The comment goes on to state that an "employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer." Rest. (2d) Agency § 393 comment e. However, the Restatement neither implies nor explicitly states, as did the court of appeals in *Electrolux* and *Mulei*, that causing co-employees to break their contracts is the only instance where an employee will be liable for breaching his duty of loyalty by soliciting co-employees. For instance, the Restatement notes that "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." *Id.*[11]

---

**11.** Other courts have recognized potential liability for soliciting co-employees even where their contracts were terminable at will. In *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 413 N.E.2d 1299 (1980), the Appellate Court of Illinois held that "the fact that the contract of employment is terminable at will does not bar

recovery" for soliciting an employee to terminate an existing employment relationship to enter the employ of another. *Id.*, 46 Ill.Dec. at 192–93, 413 N.E.2d at 1305–06. The Third Circuit Court of Appeals in *United Aircraft Corp. v. Boreen*, 413 F.2d 694 (3d Cir.1969), noted that the setting and purpose of an offer to employees

The distinction between breaching contracts terminable at will and those not terminable at will is the standard applied in the Restatement (Second) of Torts for determining liability for the tort of intentional interference with contractual relations. *See Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210–11 (Colo.1984) (noting that the Restatement (Second) of Torts "provides less protection for contracts terminable at will because an interference with a contract terminable at will is an interference with a future expectancy, not a legal right"). However, we conclude that the distinction between contracts terminable at will and those not terminable at will is not dispositive in a breach of duty of loyalty analysis. Although inducing another to breach a contract terminable at will may not lead to liability for tortious interference with contractual relations under the Restatement (Second) of Torts,[12] it does not follow that the same standard is dispositive of whether an employee breached his duty of loyalty by soliciting co-employees to leave their employ and join a new enterprise. *Compare* Rest. (2d) Torts § 768 (1977) (suggesting liability for tortious interference with contract relations only for inducing breach of contracts not terminable at will) *with* Rest. (2d) Agency § 393 (outlining general duty not to compete without specific reference to whether contracts are terminable at will).

■ To adopt the holding of the court of appeals would be to conclude that the scope of an employee's duty of loyalty with respect to solicitation of co-employees is limited to his duty to refrain from tortious interference with his employer's contractual relations with the co-employees. The court of appeals' holding thus fails to apply applicable principles of agency law and finds liability only for a breach of duties imposed by tort law. This result is readily apparent in the court of appeals' opinion in the present case, which applied the same terminable-at-will analysis to both Jet's breach of duty of loyalty counterclaim and its counterclaim for tortious interference with contractual relations. *Mulei,* 739 P.2d at 893. Such an analytical approach is fundamentally inconsistent with the broad duty of loyalty imposed on an agent/employee by the principles of agency law as stated in the Restatement. By virtue of the agency relationship, the duty of loyalty and noncompetition placed on the agent is necessarily greater than the duty imposed on all persons by tort law to refrain from wrongful interference with contract relations. *Cf. Frederick Chusid & Co. v. Marshall Leeman & Co.,* 326 F.Supp. 1043, 1060 (S.D.N.Y.1971) (employment relationship is one of confidence); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.,* 62 Ill. App.3d 671, 20 Ill.Dec. 160, 169, 379 N.E.2d 1228, 1237 (1978) (noting confidence and trust present in employment relationship); *Las Luminarias of New Mexico Council of the Blind v. Isengard,* 92 N.M. 297, 587 P.2d 444, 449 (App.1978) (it is well settled

---

under contracts terminable at will may render the offer unlawful.

The systematic inducing of employees to leave their present employment and take work with another is unlawful when the purpose of such enticement is to compete and destroy an integral part of a competitive business organization rather than obtain the services of particularly gifted or skilled employees.

*Id.* at 699 (quoting *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957)).

Finally, in *Frederick Chusid & Co. v. Marshall Leeman & Co.,* 326 F.Supp. 1043, 1060–61 (S.D. N.Y.1971), the court found that the defendants were liable for persuading co-employees to leave for a competing business even though the employees' contracts were terminable at will. The court reasoned that the solicitation of co-employees is actionable when there is a relation of confidence between the soliciting employees and the employer. Because such a relationship existed while the soliciting employees were in the plaintiff's employ, their solicitations breached their duty of loyalty. *Id. See also* Annotation, 24 A.L.R.3d 821 (1969 & 1988 Supp.).

**12.** This court has not specifically adopted the Restatement (Second) of Torts § 768 as the law of this state. *Memorial Gardens,* 690 P.2d at 211 n. 8. Previously, we have "held that even a contract terminable at will is entitled to some protection from tortious unwarranted interference." *Id.,* citing *Watson v. Settlemeyer,* 150 Colo. 326, 372 P.2d 453 (1962).

that employment relationship is one of trust and confidence).

Based on our review of the cases cited in this opinion and on the Restatement (Second) of Agency, we conclude that a court should focus on the following factors in determining whether an employee's actions amount to impermissible solicitation of co-workers. A court should consider the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the extent of any benefits promised or inducements made to co-workers to obtain their services for the new competing enterprise. No single factor is dispositive; instead, a court must examine the nature of an employee's preparations to compete to determine if they amount to impermissible solicitation. *See Bancroft–Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 839, 411 P.2d 921, 935 (1966); *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 570 (1978). Additionally, an employee's solicitation of co-workers need not be successful in order to establish a breach of his duty of loyalty. *See ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 200–01, 413 N.E.2d 1299, 1314–15 (1980) (it is misconduct itself that is wrongful; it makes no difference whether result of an employee's conduct is injurious to employer); Rest. (2d) Agency

§ 469 comment a (agent breaches duty of loyalty by acting in competition with principal even though agent's conduct does not harm principal).[13]

In the case before us, the trial court found that:

During February and March, 1983, conversations were had among Jet employees with [Mulei] regarding their interest in joining American Check Transport.

. . . .

Upon [Mulei]'s being fired, members of the office staff resigned and joined ACT and Central Air [Towner's air charter operation]. As of noon on March 10, 1983, the primary Western Zone staff had either been fired or had resigned and joined ACT.

The trial court apparently concluded that Mulei's "conversations" and the resignations of his co-employees did not violate Mulei's duty of loyalty to Jet. The basis for this conclusion apparently was at least in part the assumption that it is fully permissible for an employee to solicit co-employees whose employment contracts are terminable at will. On this point the trial court found and concluded that:

Employees other than [Mulei] who terminated their employment with Jet had jobs terminable at will. While [Mulei] formed ACT and participated in the in-

---

**13.** Application of this approach should be flexible so that actions traditionally taken by departing employees with regard to co-workers leaving simultaneously will not amount to a breach of the duty of loyalty unless other factors, such as the extent of the solicitations or nature of the offers of employment, dictate a finding of a breach of the duty of loyalty. This type of flexible approach is outlined in the commentary to the Restatement (Second) of Agency § 393:

[I]t is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm.... However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements.

Rest. (2d) Agency § 393 comment e.

Under this flexible approach, traditional actions by departing employees, such as the execu-

tive who leaves with her secretary, the mechanic who leaves with his apprentice, or the firm partner who leaves with associates from her department, would not give rise to a breach of the duty of loyalty unless other factors, such as an intent to injure the employer in the continuation of his business, were present. *See Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. 1043, 1060 (S.D.N.Y.1971) (malicious conspiracy by disloyal employees gives rise to breach of duty for soliciting co-workers); *Bancroft–Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 840–41, 411 P.2d 921, 936–37 (1966) (consistent course of conduct to obtain co-workers for competing business contributes to conclusion that employee breached his duty of loyalty); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 192, 413 N.E.2d 1299, 1305–06 (1980) (well-organized plan by key management employees to leave employer simultaneously gives rise to breach of duty for soliciting co-workers).

corporation of ACT while employed by Jet, there was no violation of any duty of loyalty to Jet.

■ However, as outlined above, whether co-employees' contracts are terminable at will is not dispositive of the breach of duty of loyalty analysis. Accordingly, we reverse the court of appeals' judgment affirming the trial court's conclusion that no breach of Mulei's duty of loyalty occurred because his co-employees' contracts were terminable at will.

Again, based on the trial court's findings and the record before us, we are unable to determine whether Mulei's pre-termination meetings with his Jet co-employees were permissible preparations for competition or whether these actions constituted solicitation of co-employees that amounted to a breach of his duty of loyalty. Accordingly, this case must be returned to the trial court for retrial for the additional purpose of determining whether under the standards of an employee's duty of loyalty set forth in this opinion, Mulei's pre-termination meetings with Jet co-employees amounted to impermissible solicitation in violation of his duty of loyalty.

### C.

■ The trial court concluded that Mulei did not violate any duty of loyalty to Jet in part because he "continued to operate the Western Zone on a profitable, efficient and service-oriented basis." Mulei now contends that this finding regarding his profitable operation of Jet's Western Zone precludes a determination that he breached any duty of loyalty to Jet. We disagree.

In a breach of employee duty of loyalty case, the Tenth Circuit Court of Appeals held that the "fact that the [employer] may have made money does not prove that no breach took place nor does it excuse one any more than a failure to make money demonstrates a breach of duty." *Wilshire Oil Co. v. Riffe*, 406 F.2d 1061, 1062–63 (10th Cir.1969), *cert. denied*, 396 U.S. 843, 90 S.Ct. 105, 24 L.Ed.2d 92 (1969). *See also Chelsea Industries, Inc. v. Gaffney,*

389 Mass. 1, 449 N.E.2d 320, 327 (1983) (denial of compensation to employees breaching duty of loyalty proper notwithstanding profitability of business during time breaches occurred).

We conclude that these same principles are applicable here. The key inquiry in determining whether Mulei breached his duty of loyalty is not whether Jet's Western Zone was profitable. Instead, the focus is on whether Mulei acted *solely* for Jet's benefit in all matters connected with his employment, and whether Mulei competed with Jet during his employment, *see* Rest. (2d) Agency §§ 387, 393, giving due regard to Mulei's right to make preparations to compete. Accordingly, the fact that Mulei operated Jet's Western Zone efficiently and profitably does not preclude a determination that he breached his duty of loyalty to Jet by his pre-termination actions. *See Wilshire Oil,* 406 F.2d at 1062–63.

### D.

■ Neither does the fact that Jet failed to make the agreed-upon quarterly bonus payments excuse Mulei from being subject to a duty of loyalty to Jet. The Restatement provides that

[t]he liability of the agent to the principal can be avoided, terminated, or reduced by a breach of contract by the principal, his contributory fault, or his failure to mitigate damages.

Rest. (2d) Agency § 415. The commentary to this section of the Restatement notes that

[u]pon a material breach of contract by the principal, unless it consists of a revocation of the agent's authority, the agent can still exercise his authority. He has the option of renouncing it; if he does so renounce, his authority terminates.... *If he does not renounce the relation, he has a duty to continue*[.] [14]

*Id.* comment a (emphasis added).

In this case, the trial court found that "[d]uring his employment, ... Mulei did

---

14. Illustration 1 to comment a is as follows:

1. P employs A to sell his goods, A to

not receive quarterly bonuses as mandated by the oral and later written contract," although he did receive from time to time payments totaling $31,000 that "may be ascribed as bonus[es]." No evidence in the record indicates that this breach of the agreement was intended to be a revocation of Mulei's authority to act for Jet and manage its Western Zone office in the manner for which he had been hired. Accordingly, Jet's breach of the employment agreement did not effect a revocation of Mulei's authority.[15]

Assuming, without deciding, that Jet's nonpayment amounted to a material breach of Mulei's employment agreement, then Mulei had the option of renouncing his authority and leaving Jet's employ. *See* Rest. (2d) Agency § 415 comment a. However, there is no evidence in the record indicating that Mulei renounced his authority; instead, the record shows he continued to act for Jet and to operate the Western Zone despite Jet's failure to make the quarterly bonus payments. If the trial court finds on retrial that Mulei did not renounce his agency/employment relation with Jet, then he had a duty to continue that relationship and a corresponding duty of loyalty. *See id.* §§ 387, 415. Thus, Jet's breach of the employment agreement would not excuse Mulei from being subject to a continuing duty of loyalty to act solely for Jet's benefit in all matters connected with his employment until the time his employment with Jet was terminated on March 10, 1983.

### E.

In sum, we conclude that the court of appeals and the trial court applied unduly narrow standards in determining what actions constitute a breach of an employee's duty of loyalty to his employer. We also conclude that despite Jet's breach of the employment agreement, Mulei's authority to act for Jet was not revoked if Mulei did

not renounce this authority. On retrial, if the trial court finds that Mulei did not renounce this authority, then Mulei was subject to a continuing duty of loyalty to Jet until his employment was terminated. Lastly, the trial court's findings of fact are insufficient to determine if Mulei's pretermination meetings with Jet's customers and employees exceeded the scope of allowable preparations for competition and breached his duty of loyalty. Accordingly, we reverse the court of appeals' judgment affirming the trial court's conclusion that Mulei did not breach any duty of loyalty to Jet, and we direct that this case be returned to the trial court for retrial to consider whether, applying the standards adopted herein, Mulei breached his duty of loyalty to Jet. The trial court should also consider the appropriate relief to be awarded based on its new findings and conclusions.

### III.

In order to provide guidance to the trial court on remand in the event it determines that Mulei breached his duty of loyalty to Jet, we consider the remaining issues on which we granted certiorari.

### A.

Jet argues that Mulei would not be entitled to any compensation or bonus payments for the period in which he was. disloyal. We agree.

The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of these services may have been properly performed. *Wilshire Oil Co. v. Riffe*, 406 F.2d 1061, 1061–62 (10th Cir.1969); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 202, 413 N.E.2d 1299,

---

receive a monthly compensation of $50. A works for P for six months during which time P refuses to pay him any salary. A is privileged to renounce his agency. He also is privileged to continue to act for P unless P's refusal to pay the salary is accompanied by conduct indicating that A has been dismissed.

**15.** However, because we remand this case for retrial, this conclusion is binding on retrial only absent presentation of different evidence.

1315 (1980) ("one who breaches fiduciary duties has no entitlement to compensation during a wilful or deliberate course of conduct adverse to the principal's interests"); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211, 1223 (1976) (employee who breached duty of loyalty must return compensation received, whether in form of salary or bonuses, during period of disloyalty); *see also Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320, 326–27 (1983) (employee who breaches duty of loyalty "can be required to forfeit the right to retain or receive his compensation for conduct in violation of his fiduciary duties"); Rest. (2d) Agency § 469 ("agent is entitled to no compensation for conduct ... which is a breach of his duty of loyalty").

Mulei again argues that he is entitled to his full compensation because even if he breached a duty of loyalty, he properly performed his duties for Jet while he was preparing to make ACT operational. Mulei's argument is inconsistent with the general rule regarding forfeiture of compensation for disloyal conduct. Moreover, other courts have rejected similar arguments and have denied compensation to an employee for services performed during any period in which the employee breached his duty of loyalty without regard to the employee's proper performance of his other contractual duties during that period. *Wilshire Oil*, 406 F.2d at 1062–63; *American Timber & Trading Co.*, 558 P.2d at 1223; *ABC Trans National Transport*, 46 Ill.Dec. at 202, 413 N.E.2d at 1315. Thus, regardless of Mulei's performance of his contractual duties, he would still be subject to forfeiture of his compensation during the period of any disloyal acts.

However, if Mulei breached any duty of loyalty, he could still recover compensation for services properly rendered during periods in which no such breach occurred and for which compensation is apportioned in his employment agreement. *Musico v. Champion Credit Corp.*, 764 F.2d 102, 112–14 (2d Cir.1985); Rest. (2d) Agency §§ 456, 469. Apportioned compensation is that paid to an agent or employee that is allocated to certain periods of time or to the completion of specified items of work.

*Musico*, 764 F.2d at 112–14; Rest. (2d) Agency § 456 comment b.

Mulei's employment contract provided that his salary was to be paid on a monthly basis, and that his bonus was to be calculated and paid on a quarterly basis. Applying the principles outlined above, if on retrial the trial court concludes that Mulei breached his duty of loyalty to Jet, then Mulei would be entitled to compensation for services properly performed during periods in which no such breach occurred and for which compensation is apportioned in the employment agreement. Moreover, under this apportionment approach, Mulei would not be entitled to any salary compensation for any month during which he engaged in acts breaching his duty of loyalty, nor would he be entitled to any bonus payments for any quarter during which he engaged in acts breaching his duty of loyalty. On retrial, the trial court should apply the principles outlined in this section to determine Jet's liability for unpaid salary and bonus compensation if it concludes that Mulei breached any duty of loyalty to Jet.

### B.

Next, Jet argues that Mulei is not entitled to a fifty-percent statutory penalty pursuant to section 8–4–104(3), 3B C.R.S. (1986), on any unpaid salary and bonus due him from Jet. Jet contends that the court of appeals erred in affirming the trial court's award of the statutory penalty since Jet had a good faith legal justification for withholding the compensation. The issue presented is a substantial one and has received only limited briefing in this case. Under these circumstances, we think it best not to provide definitive guidance but to allow the trial court in the first instance to resolve the legal issues as well as the attendant factual ones on retrial. We pause only long enough to outline some of the relevant considerations.

Section 8–4–104(3) provides that if an employer refuses to pay wages or compensation due an employee after the employee's termination by volition of the employer, then the employer is liable for a fifty-

percent penalty on and in addition to the amount owed if the refusal to pay is "without a good faith legal justification." *Id.* In this case, Jet argues that it had a good faith legal justification to refuse payment of compensation due Mulei based on Jet's claims for damages against Mulei which exceeded the amount admittedly due him. We have not previously ruled on the application of the "good faith" exception in section 8–4–104(3).[16]

Section 8–4–104 is part of an act governing the payment of wages by employers to employees. §§ 8–4–101 to –126, 3B C.R.S. (1986) (Wage Claim Act, or Act). The Wage Claim Act has its origin in legislation first adopted in 1901, *see* Ch. 55, 1901 Colo. Sess.Laws 128, and its basic structure has remained the same through the years. In general, the Act requires an employer to pay an employee at regular intervals, § 8–4–105, and upon termination of the employment relationship by volition of the employer to pay the employee immediately for all earned and unpaid wages or compensation, § 8–4–104(1). An employer is permitted to set off "any lawful charges or indebtedness" owing by the employee to the employer against the unpaid wages or compensation to be paid to the employee at the time employment is severed. § 8–4–104(2). If the employer refuses to pay wages or compensation without a good faith legal justification when it terminates an employment relationship, the employer becomes liable for a penalty in the amount of fifty percent of the amount due. § 8–4–104(3). Thus, the Wage Claim Act requires regular, periodic payments to an employee throughout his employment and provides

that the final payment of compensation be made immediately, absent a good faith legal justification for any withholding, if the employer discharges the employee.

In the present case, the trial court found that Jet became obligated to Mulei for periodic bonus payments and failed to make those payments as required by the employment contract even though they became due before Mulei engaged in the allegedly disloyal acts. This presents two basic issues to be resolved on retrial.[17] First, the trial court must determine whether the existence of Jet's claims for breach of Mulei's duty of loyalty constituted a good faith legal justification for refusal to pay any wages or compensation that first became due upon discharge. Second, it must resolve whether such claims constituted good faith legal justification for refusal to pay bonus amounts that should have been paid prior to discharge under the terms of the employment contract but were not paid by Jet. Resolution of these issues requires that the trial court construe "good faith legal justification" in section 8–4–104(3) in light of the language and purposes of the Wage Claim Act and apply that statute to the facts as found on retrial.

### C.

Lastly, Jet contends that the court of appeals erred in affirming the trial court's denial of its claims against Mulei and ACT based upon an alleged civil conspiracy to harm Jet's business. Because we remand this case for retrial, permitting further consideration of whether Mulei breached any

**16.** The Colorado Court of Appeals, however, has addressed facets of the issue on several occasions. *See, e.g., Rohr v. Ted Neiters Motor Co.,* 758 P.2d 186, 189 (Colo.App.1988) (good faith legal justification supported employer's offset, against employee's wage claim, of a claim for losses incurred due to employee's actions exceeding scope of his authority); *Coffee v. Inman,* 728 P.2d 376, 383–84 (Colo.App.1986) (a good faith legal justification for withholding wages or compensation may arise from a litigable issue on which the right to compensation depends); *Kennedy v. Leo Payne Broadcasting,* 648 P.2d 673, 675 (Colo.App.1982) (statutory penalty provision is applicable in any case where compensation is willfully withheld without good cause).

We decided a related matter in *Finance Acceptance Co. v. Breaux,* 160 Colo. 510, 419 P.2d 955 (1966). There an employer attempted to set off an employee's obligations on promissory notes owed to the employer against wages owed to the employee on discharge. We upheld the setoff only as to the amount of the wages not exempt from levy under section 77–2–4, 4 C.R.S. (1963) (now codified at § 13–54–104, 6A C.R.S. (1987)).

**17.** We do not intend by this statement to limit the issues that may be raised on retrial bearing on Mulei's claim for a statutory fifty-percent penalty.

duty of loyalty to Jet, we agree that the civil conspiracy issue should also be re-evaluated in light of the trial court's new conclusions regarding any breach of Mulei's duty of loyalty.

There are five elements required to establish a civil conspiracy in Colorado.

[T]here must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

*More v. Johnson*, 193 Colo. 489, 493, 568 P.2d 437, 439–40 (1977) (quoting *Lockwood Grader Corp. v. Bockhaus*, 129 Colo. 339, 345–46, 270 P.2d 193, 196 (1954)). The essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from it. *More*, 193 Colo. at 494, 568 P.2d at 440; *Contract Maintenance Co. v. Local 105*, 160 Colo. 190, 194, 415 P.2d 855, 856 (1966).

The court of appeals affirmed the trial court's conclusion that neither Mulei nor ACT had engaged in a civil conspiracy to harm Jet's business. Both courts based this conclusion on the absence of any unlawful act.

We have concluded above, however, that the lower courts' conclusions that Mulei did not breach his duty of loyalty were based on the application of improper legal standards. Thus, on retrial, the trial court may find that Mulei breached his duty of loyalty. If so, this finding would satisfy the unlawful act element of the civil conspiracy definition. However, the record must still contain evidence sufficient to establish the other elements in order for the court to find the existence of a civil conspiracy. The trial court made no findings concerning the other elements in this case. Be-

cause such findings are necessary in order to resolve the civil conspiracy claims, the trial court on retrial must make findings concerning the claims of Jet against Mulei and ACT for civil conspiracy and must resolve those claims on the basis of its findings.

## IV.

In sum, we reverse that portion of the court of appeals' judgment affirming the trial court's conclusion that Mulei did not breach his duty of loyalty to Jet. Additionally, we reverse the court of appeals' affirmance of the district court's assessment of a fifty percent statutory penalty against Jet on the unpaid wages and compensation. Finally, we reverse the court of appeals' holding that the district court properly denied Jet's civil conspiracy claims against Mulei and ACT. We remand the case to the court of appeals for further remand to the district court with directions to reinstate and retry Jet's counterclaim for breach of duty of loyalty and Jet's claims against Mulei and ACT for civil conspiracy, to determine the appropriate relief to be awarded if these claims are established, and to retry Mulei's statutory penalty claim,[18] all in accordance with the standards expressed in this opinion.

MULLARKEY, J., specially concurs.

MULLARKEY, Justice, specially concurring:

I concur in the majority opinion remanding this case for a new trial on Jet Courier Service, Inc.'s (Jet's) claim against Anthony Mulei for breach of his duty of loyalty. I agree that the test to be applied on retrial is as stated on page 29 of the majority opinion:

[T]he focus is on whether Mulei acted *solely* for Jet's benefit in all matters

**18.** The trial court's original calculation of the bonus amount owed Mulei was upheld by the court of appeals, and we have not reviewed that ruling here. *See* note 9, above. On retrial, this amount need be recalculated only as to any apportioned period within which it is found that Mulei breached his duty of loyalty. Finally, we remand for retrial only on Jet's civil conspiracy claims, Jet's breach of duty of loyalty counterclaim, and Mulei's statutory penalty claim. The original findings of the trial court and the judgment of the court of appeals on claims and issues not considered in this certiorari proceeding remain in effect for the purpose of those claims and issues and are not to be retried.

connected with his employment, and whether Mulei competed with Jet during his employment, *see* Rest. (2d) Agency §§ 387, 393, giving due regard to Mulei's right to make preparations to compete. (Emphasis in original.) I write separately to emphasize that this is the appropriate test to determine a breach of loyalty when an employee is acting as the employer's agent. In this case, there seems to be no question that Mulei was acting as Jet's agent because of the position he occupied with the company and his duties and responsibilities. However, not every employee is the employer's agent, and an employee may act as an agent with regard to certain job functions but not with regard to others. *See* Note, *The Implied Covenant of Good Faith and Fair Dealing: Examining Employees' Good Faith Duties*, 39 Hastings L.J. 483, 498 n. 94 (1988). Thus, the duty of loyalty and the test for a breach of that duty may well be different if the employee is not an agent. *See id.* at 499 n. 102.

I also write separately to amplify the majority's discussion of the Wage Claim Act (the Act) in Part III.B.

As the majority states at page 501, the Wage Claim Act originally was enacted in 1901 and was entitled "An Act Providing For The Regulation Of The Payment Of Wages, Of Employes Of Corporations And Providing A Penalty For The Violation Thereof." Ch. 55, 1901 Colo.Sess.Laws 128. Although the Act has been amended periodically, its basic scheme has remained remarkably unchanged. The law always has had two basic components. First, the employer is required to pay the employee at regular intervals. § 8-4-105, 3B C.R.S. (1986). Second, when the employment relationship is terminated, the employer is required to pay the employee for all earned and unpaid wages or compensation. § 8-4-104, 3B C.R.S. (1986). Since its inception, the Act has provided the employee with a private right to sue his employer for failure to pay in accordance with the Act and has imposed penalties in the form of liquidated damages plus attorneys' fees. The statutory penalty, which was set at five percent in 1901, is now fifty percent of

the compensation due. § 8-4-104(3), 3B C.R.S. (1986).

Our present codification of the statute includes a requirement that the employer have funds on hand to pay the employee, § 8-4-103, 3B C.R.S. (1986), and prohibits the payment of wages in scrip, § 8-4-102, 3B C.R.S. (1986). These provisions come from the state's so-called "Truck System" law which was debated and enacted at about the same time as the Wage Claim Act. *See In re House Bill No. 147*, 23 Colo. 504, 48 P. 512 (1897). The Wage Claim Act and Truck System law fairly can be considered as companion legislation which should be construed together.

While no legislative history as such exists for laws of this vintage, contemporary decisions by this court give important insight into the purposes and historical context of these laws. The constitutionality of the bill which later became the Wage Claim Act was raised by the Senate in interrogatories which it submitted to this court. *In re Senate Bill No. 27*, 28 Colo. 359, 65 P. 50 (1901). Although this court declined to answer the interrogatories because only the rights of private parties were at stake, we described the bill, in part, as follows:

[T]he general object of the bill is to require all private corporations doing business within this state ... to pay to their employees the wages earned each and every 15 days in lawful money of the United States, payable on the 5th and 20th of each calendar month, for all wages earned up to and within five days of such payment.

. . . . .

[P]enalties are prescribed for a violation of the provisions of the act, and attorneys' fees are awarded to the successful party in suits brought by employes to collect their wages thereunder.

*Id.* at 360, 65 P. at 50-51. We observed that the wage claim bill had the same purpose as an earlier Truck System bill prohibiting payment of employees in scrip, but that the wage claim bill "goes further, and

also makes mandatory the semimonthly payment of wages." *Id.* at 361, 65 P. at 51.

In a case concerning a proposed Truck System bill, we held that the legislature had the power to "enact laws of this character when necessary to prevent oppression and fraud, and for the protection of classes of individuals against unconscionable dealings." *In re House Bill No. 147*, 23 Colo. 504, 507, 48 P. 512, 513 (1897). The court recognized the historical background which led to these bills:

> We may properly take cognizance of the fact that the most serious disturbances which have occurred in this country for the last 25 years have grown out of controversies between employer and employe. No one doubts the authority or questions the duty of the state to interfere with such force as may be necessary to repress such disturbances and maintain the public peace and tranquility; and as well may the state provide in advance against certain kinds of fraud and oppression, which lead to these outbreaks.

*Id.*

Thus, it is clear that the intent of these labor laws was to protect employees from exploitation, fraud and oppression by requiring employers to pay workers in United States currency at regular intervals. At present, section 8–4–105(1), 3B C.R.S. (1986), requires that pay periods be "of no greater duration than one calendar month or thirty days, whichever is longer," and regular paydays must occur "no later than ten days following the close of each pay period." The employer and the employee are permitted to "mutually agree on any other alternative period of wage or salary payments." § 8–4–105(1). On a monthly basis or at the time each payment of wages or compensation is due, the employer is required to furnish the employee with an itemized pay statement showing, among other things, the gross and net wages earned during the pay period. § 8–4–105(4), 3B C.R.S. (1986). If the employee is fired by his employer, he must be paid immediately for all wages or compensation earned and unpaid at the time of his discharge. § 8–4–104(1), 3B C.R.S. (1986). As the majority notes at page 501, the

scheme of the Act, which has remained constant from its beginning, is to require regular, periodic payments of an employee throughout his employment and to provide that the final wage payment be made immediately if the employer discharges the employee.

Since the employer must make periodic wage payments under section 8–4–105, only the final payment can be at issue under section 8–4–104 when the employment relationship is terminated. Nothing in the Act permits an employer to withhold any earlier payment for any reason. To allow withholding of past-due compensation for any reason would be contrary to the main purpose of the Act which, as we said in *In re Senate Bill No. 27*, was to make *mandatory* the periodic payment of wages. 28 Colo. at 361, 65 P. at 51.

Under section 8–4–105 of the Act, Mulei was entitled to a quarterly accounting of his bonus and was entitled to have his bonus paid on a quarterly basis. The facts of this case, of course, will be determined on retrial. If it is found, as it appears from this record, that Jet violated the Act by failing to make the quarterly bonus payments in 1981 and 1982, then Jet has no "good faith legal justification" under section 8–4–104(3) for withholding payment of those amounts when Mulei was fired. An employer cannot violate the terms of the Act by failing to make periodic payments and, at the same time, shelter the unpaid compensation by claiming the protection of the set-off provision of the Act. If the 1981 and 1982 bonuses are not subject to Jet's set-off claim, Mulei should recover his bonuses for those years plus the fifty percent statutory penalty.

The question remains to be decided on retrial whether Mulei's salary for March 1983 and his bonus for the first quarter of 1983 are subject to section 8–4–104(2), 3B C.R.S. (1986), which permits an employer to "set off any lawful charges or indebtedness owing by the employee to the employer." Wage set-offs are strongly disfavored under Colorado law, as is indicated by our decision in *Finance Acceptance Co. v.*

*Breaux,* 160 Colo. 510, 419 P.2d 955 (1966). There, an employer sued a former employee who had defaulted on a promissory note and the employee counterclaimed for unpaid wages. Because the employee was judgment-proof, the employer sought to set off the wage claim against the much larger amount which the employee owed on the promissory note. We held that only part of the wage claim could be set off against the unpaid loan because state law prohibited attachment of more than thirty percent of an employee's wages, an amount which is now twenty-five percent. *See* § 13–54–104(2)(a), 6A C.R.S. (1987).

Set-offs against wage claims are disfavored because of the inherent economic inequity between the employer and employee. Withholding an employee's paycheck is a form of employer self-help which permits the employer to obtain relief immediately without submitting its claim to adjudication. The adverse economic impact on the employee is direct and potentially devastating while the economic benefit to the employer is relatively insignificant. The Wage Claim Act recognizes that many employees live from paycheck to paycheck and that a set-off against wages is a drastic remedy which must be strictly limited.

In 1986, our legislature considered the operation of the set-off provision in the Wage Claim Act. By adding a definition of "lawful charges and indebtedness" in section 8–4–101(7.5), 3B C.R.S. (1986), the legislature clarified what type of employer claims may be set off against unpaid wages when an employee is terminated. Ch. 65, sec. 1, § 8–4–101(7.5), 1986 Colo.Sess.Laws 504. The new definition reads:

> "Lawful charges or indebtedness" shall not include deductions made from an employee's wages or compensation for any of the following reasons: Cash or inventory shortages except for shortages caused by theft, breakage, alleged negligent acts, dishonored customer credit charges or checks, workmen's compensation, or penalties assessed for infractions or *for violating employer policies except for previously established written policies.*

(emphasis added). The underscored language of the amendment, which took effect after the events in this case, prohibits future employer set-offs for an alleged breach of an employee's implied common law duty of loyalty. The legislative history shows that the amendment to the Act was intended to identify permissible employer set-offs and to curtail what the legislators regarded as widespread abuses of the Act's set-off provision. *See* Tape Recording of Testimony Before House Business Affairs and Labor Committee on House Bill 1231, February 11, 1986, 55th General Assembly.

I do not read the majority opinion as deciding whether Jet has a valid set-off claim. Rather that issue is left to the determination of the trial court. At 501. I simply emphasize my view that no such set-off claim is permitted after the effective date of the 1986 amendments.

For these reasons, I specially concur in the majority opinion.