23CA1586 Pentelute v Batenburg 12-19-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1586
City and County of Denver District Court Nos. 19CV34536, 19CV34558 & 19CV34695
Honorable Ross B.H. Buchanan, Judge
Honorable Andrew J. Luxen, Judge

---

Justin Pentelute, Maggie Regalia, and Tellus Core, Inc.,

Plaintiffs-Appellees,

v.

Richard M. Batenburg, Jr.; Clear Cannabis, Inc.; Subtle Escape, LLC; Subtle Relief, LLC; Cliintel Capital Group Aggressive Growth IV, LLC; Batmann Consulting, Inc.; Cliintel, LLC; Cliintel Capital Management Group, LLC; and Cliintel Capital Group, LLC, d/b/a Clear Colorado Group,

Defendants-Appellants.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 19, 2024

---

Fortis Law Partners LLC, Cara Thornton, Henry M. Baskerville, Denver, Colorado, for Plaintiffs-Appellees

Haddon, Morgan and Foreman, P.C., Adam Mueller, Jacob McMahon, Denver, Colorado, for Defendant-Appellant Richard M. Batenburg, Jr.

Allen Vellone Wolf Helfrich & Factor P.C., Jordan Factor, Jeremy T. Jonsen, Vandana S. Koelsch, Denver, Colorado, for Defendant-Appellant Clear Cannabis, Inc.

Recht Kornfeld, P.C., Thomas M. Rogers III, Nathan A. Bruggeman, Denver, Colorado, for Defendants-Appellants Subtle Escape, LLC; Subtle Relief, LLC; Cliintel Capital Group Aggressive Growth IV, LLC; Batmann Consulting, Inc.; Cliintel, LLC; Cliintel Capital Management Group, LLC; and Cliintel Capital Group, LLC, d/b/a Clear Colorado Group

¶ 1      Richard M. Batenburg, Jr.; Clear Cannabis Inc. (CCI); Subtle Escape, LLC (SE); Subtle Relief LLC (SR); Cliintel Capital Group Aggressive Growth IV, LLC (CCAG IV); Batmann Consulting, Inc. (Batmann); Cliintel LLC, d/b/a EvolutionZ Consulting (Cliintel); Cliintel Capital Management Group, LLC (CCMG); and Cliintel Capital Group, LLC, d/b/a Clear Colorado Group (CCG) (collectively, Joint Appellants), appeal the district court's judgment in favor of Justin Pentelute, and Maggie Regalia[1] and Tellus Core Inc. (Tellus). We affirm in part, reverse in part, and remand the case with directions.

## I.    Background

¶ 2      This case arises out of a contract dispute between Pentelute and Batenburg after their business relationship deteriorated. Pentelute joined Batenburg's company, Batmann, in late 2016 and served as its CEO. Batmann, and Batenburg through Batmann, owned and operated several companies. The companies relevant for this appeal are as follows:

---

[1] The claims against Regalia, and her counterclaims, were dismissed in the district court by stipulation, and she did not participate in this appeal.

- Batmann: The holding company owned by Batenburg that many of the companies involved in this case were affiliates of and for which Pentelute served as CEO until 2019.

- Cliintel: A company owned by Pentelute, formerly known as EvolutionZ Consulting (Sunny Money, d/b/a EvolutionZ Consulting), that was merged with Cliintel and became an affiliate of Batmann in 2017 and of which Pentelute served as CEO until 2019.

- SR: A company formed by Pentelute after he joined Batmann that produces cannabidiol (CBD) vaping oil.

- SE: A company formed by Pentelute after he joined Batmann that produces CBD vaping hardware products.

- CCG: A marijuana-infused products manufacturer.

- CCAG IV: A private equity investment fund.

- CCMG: A venture capital firm.

- CCI: The new company Batenburg formed — to absorb assets from SE, SR, and Cliintel — with the founders of Headspace International (Headspace). (Headspace is a

2

flavored vape cartridge manufacturer that sold its products under a brand called "Clear.")

¶ 3　　When Pentelute joined Batmann, he merged his company into Batmann in exchange for a 35% ownership of Batmann's common stock, with Batenburg retaining the remaining shares (65%). Pentelute then negotiated a master license agreement (MLA) between Headspace and Batmann, designating Batmann as the "global licensee" for Headspace's flavored vape products under the Clear brand for five years and allowing Batmann to serve as a licensor for sublicensees selling Clear brand products to dispensaries.  Because of royalties from sublicensing agreements via the MLA, and the corresponding increase in demand for packaging and hardware produced by SE and CBD products produced by SR, marijuana product sales through CCG and consulting by Cliintel, SE, SR, and CCG soon became important profit sources for Batmann.

¶ 4　　In early 2018, however, Pentelute and Batenburg's relationship soured.  Pentelute initially sought to buy out Batenburg, with Batenburg's initial support.  Pentelute created Tellus to buy out Batenburg's shares and hoped to later acquire the

MLA, SR, SE, and Cliintel. But a deal never materialized, and Pentelute instead sued Batenburg in December 2018. After mediation, the parties reached a settlement. The settlement was memorialized in four different documents, the (1) "Settlement Agreement and Mutal Release" (the Settlement Agreement); (2) "Stock Redemption Agreement"; (3) "Promissory Note"; and (4) "Security Agreement," all executed on February 17, 2019.

¶ 5     Under the Settlement Agreement, Pentelute agreed to release Batenburg, Batmann, and Batmann's affiliates from all claims in exchange for Batenburg redeeming all Pentelute's shares in Batmann. The Settlement Agreement defined Batmann's affiliates to include, as relevant here, SE, SR, Cliintel, CCG, CCAG IV, and CCMG. Batenburg signed the Settlement Agreement individually and on behalf of Batmann and its affiliates. The parties agreed to pay Pentelute for the shares in accordance with the Stock Redemption Agreement, incorporated as Exhibit A to the Settlement Agreement.

¶ 6     The Stock Redemption Agreement detailed that Batmann would pay Pentelute $2.5 million for his shares of Batmann with $200,000 paid immediately and the remaining $2.3 million paid in

4

installments under the Promissory Note, incorporated as Exhibit A to the Stock Redemption Agreement. The Stock Redemption Agreement also required that parties execute the Security Agreement, incorporated as Exhibit B to the Stock Redemption Agreement.[2] The Stock Redemption Agreement provided that the Stock Redemption Agreement, the Settlement Agreement, the Promissory Note, and the Security Agreement together constituted "the entire agreement of the parties with respect to the subject matter hereof." Batenburg signed the Stock Redemption Agreement in his capacity as Batmann's president.

¶ 7 Under the Promissory Note, Batmann, as the "Maker," agreed to pay Pentelute $2.3 million plus interest in monthly payments over two years. The Note defined "Maker" to include Batmann and Batmann's "respective heirs, successors, legal representatives and assigns, whether voluntary by action of the parties or involuntary by operation of law" and provided that its "rights and obligations

---

[2] The Stock Redemption Agreement referenced two other exhibits not relevant for this appeal: (1) Pentelute's original stock certificates along with a "duly executed Stock Transfer Power" form transferring the shares to Batmann (Exhibit C); and (2) Pentelute's letter of resignation from Batmann (Exhibit D).

shall not be assignable or transferable" without Pentelute's written consent. Lastly, it added that the Promissory Note was secured by a lien on Batmann's assets in accordance with the Security Agreement. Batenburg signed the Promissory Note as Batmann's president.

¶ 8 The Security Agreement identified Pentelute as the "Secured Party" and Batmann and Batmann's affiliates (defined as SR, SE, and Cliintel) as the "Borrowers." As collateral for the Promissory Note, the Security Agreement granted Pentelute a security interest in the "Borrower's present and future right, title and interest in all of the Borrower's accounts receivable existing from time to time." The Borrowers represented that until their obligations under the Promissory Note were satisfied, they would not (1) create any other security interests to the accounts receivable collateral; (2) "[p]erform a corporate restructuring" except for in the ordinary course of business; or (3) create security interests in, sell, or assign any of their assets except in the ordinary course of business.

¶ 9 Significantly, the Security Agreement added that it was binding on all "the Borrower's successors and assigns, and shall inure to the benefit of the Secured Party, its successors, and

assigns." Batenburg signed the Security Agreement on behalf of Batmann and its affiliates as Batmann's president. Throughout the litigation, Batmann, Cliintel, SR, and SE were referred to as the "Borrower Entities."

¶ 10    Batenburg testified that from the end of 2018 through early 2019, during the negotiations of the agreements, he had been planning to "roll up" several of the Batmann companies into another corporate entity, CCI (the Roll Up). At Batenburg's instruction, CCI was incorporated on February 5, 2019, shortly before the four settlement documents were executed on February 17, 2019, and Batenburg became CCI's CEO. In April 2019, CCI initiated the Roll Up, providing CCI stock to Headspace in exchange for the Clear brand's intellectual property and providing CCI stock to Batmann in exchange for SE, SR, and Cliintel (which became "wholly-owned subsidiaries" of CCI).

¶ 11    After the Roll Up, CCI began collecting the royalty payments made to Batmann under the MLA, including payments from CCG, and Batmann no longer had any accounts receivable for its Clear brand sublicense agreements. And, as subsidiaries of CCI, SE, SR,

and Cliintel[3] channeled all income to CCI and transferred all accounts receivable and assets to CCI.

¶ 12    According to an offering memorandum prepared for CCI in September 2019, Batenburg was CCI's chairman, president, and secretary and owned 82% of its outstanding shares.  The same memorandum detailed that Batenburg owned 98% of Batmann, "30% of CCAG IV" and "65% of CCMG" indirectly through Batmann, and "40% of [CCI]" directly.  Further, it provided that CCAG IV owned "30% of [CCI]."  Batenburg served as the manager for CCMG, and CCMG (under Batenburg's majority control), in turn, acted as CCAG IV's manager.

¶ 13    In accordance with the Stock Redemption Agreement, in February 2019, Pentelute received the initial $200,000 payment. Pentelute also received monthly payments from March to October 2019 per the Promissory Note.  Batenburg personally loaned the payments to Batmann, except for the October payment, which was only a partial interest payment and the last payment Pentelute received.  Batenburg testified that he could not continue paying

---

[3] Batenburg testified that Cliintel had "no ongoing operations" and "does not exist" as it was previously known.

8

Pentelute on Batmann's behalf until CCI went public.  Because Batmann had no other revenue, Batenburg sought to renegotiate the payment schedule with Pentelute.[4]

¶ 14    When Batenburg proposed renegotiating the payment schedule, Pentelute requested financial information on Batmann and soon realized that his collateral had been transferred to CCI. Pentelute gave a notice of default for Batmann's failure to make payments under the Promissory Note, with an opportunity to cure, on November 22, 2019, but Batenburg did not cure the breach. Instead, on November 26, Batenburg sued Batmann for the unpaid loans he made to Batmann, and thereafter, Cliintel sued Maggie Regalia (Cliintel's financial "controller") and Tellus.  Pentelute sued Joint Appellants on December 10, 2019.  The district court consolidated all three cases on January 29, 2020.

---

[4] Batenburg answered affirmatively during his direct examination that he "controlled all agreements that Batmann made[,] . . all contracts it entered into[,] . . . [and] what assets Batmann transferred."  He also testified that he had the same level of control over SE, SR, and Cliintel.  He also testified that he was the "managing member" of CCMG, which owned CCAG IV, and was the managing member of CCG.  To clarify, Pentelute's counsel asked Batenburg, "[E]ither you or a company you control, is a majority owner of every single entity named in Mr. Pentelute's complaint, right?"  Batenburg answered, "I believe that's accurate."

## II. The District Court's Judgments

¶ 15 After a bench trial, the district court largely found in Pentelute's favor. As relevant here, the court found that, as part of the Roll Up, Batmann fraudulently transferred the MLA and its interests in SE, SR, and Cliintel to CCI, including their accounts receivable, and that Batmann had not received "reasonably equivalent value" in the illiquid CCI stock it received in return. Therefore, Batmann's transfers were fraudulent as defined in section 38-8-106(1), C.R.S. 2024. It also found that the transfers were fraudulent under section 38-8-105(1)(a), C.R.S. 2024, as the transfers were made "[w]ith actual intent to hinder, delay, or defraud" Pentelute.

¶ 16 The court also found that "Batmann and CCG engaged in civil theft" under sections 18-4-401 to -405, C.R.S. 2024, when CCG (at Batenburg's direction) began paying royalties to CCI instead of to Pentelute, despite Pentelute having sent notice of his secured interests per section 4-9-607(a)(1), C.R.S. 2024, to "some of CCI's customers." The court found CCG knowingly obtained control over Pentelute's property without authorization with the intent to permanently deprive Pentelute of his property.

¶ 17    Next, the court found that two breaches of contract occurred. First, it found that there was "little question that the Secured Promissory Note was breached" by its Maker, and its assigns (including CCI), because the required payments were not made. Second, the court found that "it is equally clear that Batenburg and the Borrower Entities" (SR, SE, and Cliintel) violated the Security Agreement when "Mr. Batenburg assigned the accounts receivable of the Borrower Entities to CCI, restructured through the Roll-Up transactions in a manner that impaired the collateral, and sold or assigned the Borrower Entities['] assets to CCI." The court also found that "CCI is a successor to each of the Borrower Entities" per the Security Agreement.

¶ 18    The court rejected Joint Appellants' defense that Pentelute had not performed under the Security Agreement by failing to return or destroy all of Batmann's property and by Pentelute retaining access to Batmann's digital information synced to his computer. The court found that Pentelute's failure to return or destroy these materials did not constitute a material breach of the Security Agreement and thus did not excuse nonperformance by Batmann and its affiliates.

11

¶ 19　Next, the district court found that Joint Appellants engaged in a civil conspiracy when the relevant companies transferred their assets to CCI, rendering Batmann "a worthless shell" so that "Pentelute would have nothing to execute upon." The court highlighted that CCI and Batmann pursued this objective because both were parties to the Stock Redemption Agreement under which Batmann agreed to transfer the MLA and ownership interests in SE's, SR's, and Cliintel's assets to CCI in exchange for stock. And it noted that CCAG IV also sought this objective because it owned stock in SE and SR which it also assigned to CCI. Finally, CCG furthered the conspiratorial objective transferring MLA royalty payments to CCI.

¶ 20　The court rejected the claims raised against Pentelute and Tellus with prejudice. As a result, the court entered judgment in favor of Pentelute for fraudulent transfer, breaches of the Promissory Note and Security Agreement, and civil conspiracy and against Batenburg (individually), Batmann, CCI, SE, SR, Cliintel, CCMG, CCAG IV, and CCG. The court awarded "damages in the amount of the unpaid payments due under the Secured Promissory Note" plus interest.

¶ 21    Next, the court entered judgment in Pentelute's favor for civil theft and against Batenburg and CCG, "awarding damages in the amounts paid by CCG to CCI which were due by contract to Batmann, Cliintel, or any of the Borrower Entities, together with the penalty [in section] 18-4-405[, C.R.S. 2024,]" plus interest.

¶ 22    CCMG, CCAG IV, CCG, Batmann, Cliintel, SR, SE, and Batenburg all filed motions for judgment notwithstanding the verdict (JNOV) pursuant to C.R.C.P. 59, but they were denied by operation of law.  *See* C.R.C.P. 59(j).

### III.    Issues on Appeal

¶ 23    Joint Appellants raise seven main arguments in their merits appeal, arguing that the district court erred by

- rejecting Joint Appellants' fraudulent inducement affirmative defense;

- finding CCMG, CCAG IV, CCG, and Batenburg — nonparties to the Promissory Note and Security Agreement — liable for breach;

- finding Joint Appellants liable for civil theft;

- finding Joint Appellants liable for fraudulent transfer;

13

- finding Joint Appellants liable for civil conspiracy when affiliated corporate entities cannot conspire with each other;

- altering the liability determinations made in the court's "Findings of Fact, Conclusions of Law, and Judgment" (findings order) via entry of the "Modified Judgment in Sum Certain Order" (Amended Final Judgment Order); and

- miscalculating the damage award for breach of contract.

Joint Appellants also argue that because a new trial is required based on these errors, the district court's cost award must be vacated. Pentelute requests appellate attorney fees and Tellus requests costs.

## IV. Preservation and Standard of Review

¶ 24    "To properly preserve an argument for appeal, the party asserting the argument must present 'the sum and substance of the argument' to the district court." *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25 (citation omitted). Arguments raised for the first time in a post-trial motion or motions for reconsideration are not preserved for appellate review. *Briargate at Seventeenth Ave.*

14

*Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 66; *Fid. Nat'l Title Co. v. First Am. Title Ins. Co.*, 2013 COA 80, ¶ 51 (where an argument raised in a trial management order differed from the argument raised in a post-trial C.R.C.P. 59 motion, the latter argument was not preserved for appeal); *see also People v. Schaufele*, 2014 CO 43, ¶¶ 43, 46, 49 (Boatright, J., concurring) ("Motions for reconsideration are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal arguments for the first time and then appeal their denial . . . .").

¶ 25　　Further, affirmative defenses raised for the first time in a post-trial motion are waived because they were not affirmatively pleaded in accordance with C.R.C.P. 8 and are not preserved for appellate review when later raised for the first time in a post-trial motion. C.R.C.P. 8(c) (Any claim "constituting an avoidance or affirmative defense . . . [or] mitigating circumstances to reduce the amount of damage shall be affirmatively pleaded."); *see Blood v. Qwest Servs. Corp.*, 224 P.3d 301, 328-29 (Colo. App. 2009), *aff'd*, 252 P.3d 1071 (Colo. 2011); *see also Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 2016 COA 176M, ¶ 43; *Fid. Nat'l Title*, ¶ 51; *Crocker v. Colo. Dep't of Revenue*, 652 P.2d 1067, 1071 (Colo. 1982).

¶ 26    "The interpretation of a contract is a question of law that we review de novo." *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24. We defer to the district court's factual findings "unless they are clearly erroneous." *Id.* And when "interpreting a contract, our primary goal is to give effect to the parties' intent." *Id.* at ¶ 25. When a contract's language is clear, we enforce it as written. *Id.*

¶ 27    We interpret contracts according to the document's plain language and avoid interpretations that lead to absurd results, defeat the parties' intentions, *Quarky, LLC v. Gabrick*, 2024 COA 76, ¶ 11, or render any provision meaningless, *Newflower Mkt., Inc. v. Cook*, 229 P.3d 1058, 1061 (Colo. App. 2010). We also ascertain a contract's meaning by looking to the entire document rather than "viewing clauses or phrases in isolation." *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 50 (citation omitted).

## V.    Analysis

### A.    Fraudulent Inducement Defense

¶ 28    Joint Appellants first argue that the district court erred by not considering their fraudulent inducement defense for Pentelute's breach of contract claims. They argue that Pentelute fraudulently

induced them to execute the Settlement Agreement by representing that he had returned or destroyed all company property.

¶ 29     While the district court did not directly address this argument, evidently deeming it abandoned, Joint Appellants' fraudulent inducement defense is substantively identical to their material breach of contract defense against Pentelute, which the district court rejected.  Thus, any alleged error would be harmless because the court found that the breach of contract defense failed, so a fraudulent inducement defense would have also failed for the same reasons.

> In order to prevail on a claim for fraud, one must establish: (1) a false representation concerning a material existing fact; (2) knowledge on the part of the one making the representation of its falsity; (3) ignorance of its falsity on the part of the one to whom the representation was made; (4) an intention by the person making the representation that it be acted upon; and (5) action on the representation resulting in damage to the claimant.

*W. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1077 (Colo. App. 1991), *aff'd*, 849 P.2d 44 (Colo. 1993) (citation omitted).

¶ 30     Joint Appellants argue that Pentelute falsely represented that he had returned or destroyed all Batmann's property when

company documents remained on his personal computer. They argue that this misrepresentation was material and that Batenburg justifiably relied on these representations. And they further argue that the misrepresentation caused them damages because the records taken were valuable, they "could" provide Pentelute a business advantage, and Pentelute's failure to return or destroy them breached the MLA.

¶ 31    But the district court addressed these allegations in its discussion of Pentelute's breach of contract claims and Joint Appellants' material breach defense, noting that much "of the evidence at trial concerned whether Pentelute had performed under the agreements, and specifically whether he had complied with his obligation" to return or destroy Batmann's property. That contractual representation, namely that "Pentelute represents that he has returned and/or destroyed all property of Batmann Consulting and its Affiliates," also supported the allegations for the fraudulent inducement claim.

¶ 32    In other words, Joint Appellants contend that Pentelute failed to perform this contractual representation but also that their execution of the agreements was conditioned on it. But the court

found that Pentelute did not materially breach this representation. It found that the key categories of documents Pentelute retained included "(1) spreadsheets listing the ingredients of The Clear flavor formulas developed by Headspace; (2) Cliintel's Investor Logs; and (3) portions of Cliintel's 'SalesForce' software."

¶ 33 The court first found that the flavor formulas were not Batmann's or its affiliates' property, nor did they have a proprietary interest in them. Next, the investor logs' retention did not constitute a material breach because they predated Pentelute's time at the company and "largely consisted of his friends and contacts from previous business ventures." At trial, "defendants could only document a single investor who . . . was listed on the investor log and had been contacted by Pentelute." Finally, the court found, regarding the SalesForce software, that "Defendants did not offer evidence regarding exactly what the documents were, other than to suggest that they might be helpful to starting a new business," and, again, they were largely simple forms that Pentelute had been compiling before his time with Batmann.

¶ 34 The court recognized that, "[t]o be sure, the sheer volume of the documents Mr. Pentelute retained might suggest that his

retention of them was intentional, and not merely incidental or an oversight." But it credited Pentelute's testimony that he was unaware these files were even on his computer and ultimately found that "Mr. Pentelute had played no role in requesting or storing" the documents on his computer because the syncing of corporate documents to Pentelute's personal computer from the intranet was automatic, until it was turned off (once Batmann's "oversight" was discovered).

¶ 35    Further, the district court found that "Batmann was unable to demonstrate that Mr. Pentelute had utilized any of the documents to its detriment." This was particularly true given that immediately upon receiving notice that Pentelute had these files, he made a forensic copy of his hard drive, which he provided to Joint Appellants, and then deleted the files. Therefore, the district court found that Pentelute's possession of the files was not a material breach of the Settlement Agreement, and we must defer to the district court's factual findings where they are not clearly erroneous. *See French*, ¶ 24.

¶ 36    While these findings relate to breach of contract, they provide insight into the merit (or lack thereof) of Joint Appellants'

20

fraudulent inducement defense. *See Deutsche Bank Tr. Co. Ams. v. Samora*, 2013 COA 81, ¶ 38 ("An appellate court may affirm the trial court's ruling based on any grounds that are supported by the record."). In particular, the findings illustrate that Joint Appellants failed to prove that Pentelute's representation that he had returned or destroyed all of Joint Appellants' documents was materially false.

¶ 37 Moreover, the court's finding that Pentelute "played no role in requesting or storing" the documents that were synced to his computer undermines the knowledge element of the fraudulent inducement defense. *See Schueller*, 830 P.2d at 1077. In other words, the district court's finding that Pentelute did not materially breach the representation provision in the Settlement Agreement necessarily forecloses a finding that the same representation was a fraudulent inducement. *See id.* The district court's factual findings on these points enjoy record support and are not clearly erroneous. *See French,* ¶ 24.

¶ 38 Thus, even if the district court erred by not separately addressing Joint Appellants' fraudulent inducement defense, any such error was harmless because the outcome necessarily would have been the same given the court's breach of contract findings.

21

*See* C.A.R. 35(c) ("The appellate court may disregard any error or defect not affecting the substantial rights of the parties.").

### B.  Breach of Contract

¶ 39    Next, Joint Appellants argue that the district court erred by imposing contractual liability on nonparties to the Promissory Note and the Security Agreement — namely CCMG, CCAG IV, CCG, and Batenburg.  They also argue that the court erred by holding CCI liable as a "Maker" and "successor" of the Promissory Note and an "assign" of the Security Agreement because it was not a party to these agreements.  We conclude that the court erred by holding CCMG, CCAG IV, CCG, and Batenburg liable for breaching the Promissory Note and Security Agreement, but that CCI is an assign and successor to these agreements and could be held liable for breaching these agreements.

¶ 40    "[A] contract cannot bind a nonparty." *Equal Emp. Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  Only Batmann was a signatory to the Promissory Note, and only Batmann and its affiliates SR, SE, and Cliintel, were signatories to the Security Agreement.  Thus, only Batmann could be held liable for breaching the Promissory Note, and only Batmann, SR, SE, and

Cliintel could be held liable for breaching the Security Agreement. To hold otherwise would undermine the parties' intent in designating different companies as signatories to the respective agreements. *See Quarky*, ¶ 11.

¶ 41 CCI, however, was properly held liable as a "Maker" and "successor" of the Promissory Note and Security Agreement. The district court found that CCI was Batmann's assignee by looking to the Stock Exchange Agreement (signed by Batenburg on behalf of CCI and Batmann). Batmann agreed to transfer the MLA and 86%, 34%, and 90% of its membership interests in Cliintel, SE, and SR, respectively, to CCI in exchange for over six million shares of CCI common stock for $0.00001 per share. The court found that CCI was a successor to the Borrower Entities, i.e., Batmann, SR, SE, and Cliintel, because the Borrower Entities transferred their accounts receivable to CCI. These findings reflect no error.

¶ 42 The Promissory Note explicitly details that Batmann was bound to the agreement as well as Batmann's "respective heirs, successors, legal representatives and assigns, whether voluntary by action of the parties or involuntary by operation of law." And the Security Agreement detailed that it was binding on all of the "the

Borrower's successors and assigns" and would "inure to the benefit of the Secured Party, its successors, and assigns." Joint Appellants argue that because CCI was not a party to the Promissory Note and Security Agreement, and because it did not assume Batmann's obligations when Batmann continued to make payments to Pentelute from March through October 2019, CCI cannot be deemed an assign or successor of Batmann.

¶ 43 Black's Law dictionary broadly describes an assignee (also called an "assign") as "[s]omeone to whom property rights or powers are transferred by another." Black's Law Dictionary 145-46 (12th ed. 2024); *see also Allstate Ins. Co. v. Med. Lien Mgmt., Inc.*, 2015 CO 32, ¶ 9 (An assignment is "taken generally as a transfer of rights or property from one person to another." (citing Black's Law Dictionary 142 (10th ed. 2014))). It defines a "successor" as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." Black's Law Dictionary 1738 (12th ed. 2024); *see also Ginny's Kids Int'l, Inc. v. Off. of Sec'y of State*, 29 P.3d 333, 336 (Colo. App. 2000) (citing Black's Law Dictionary 1446 (7th ed. 1999)) (providing the same definition of "successor").

¶ 44     CCI meets both definitions.  Batmann transferred its most profitable assets to CCI in exchange for (essentially worthless) stock, and the Borrower Entities became subsidiaries of CCI; thus, CCI became the successor to the Borrower Entities.  CCI was also an assignee of Batmann's assets, including the Borrower Entities' accounts receivable.  Therefore, CCI is liable for the breach of the Promissory Note and Security Agreement.

¶ 45     Joint Appellants rely on the principle that "[g]enerally, a corporation that acquires the assets of another corporation does not become liable for the debts of the selling corporation."  *CMCB Enters., Inc. v. Ferguson,* 114 P.3d 90, 93 (Colo. App. 2005).  But this ignores the relevant exception that "successor corporations have been held liable if . . . there is an express or implied assumption of liability."  *Id.*  The Promissory Note and Security Agreement expressly provided that the parties' assigns and successors would be bound by the agreements — which reflects the clear intent of the parties because otherwise, as here, the relevant companies' assets could be transferred and the subject collateral jeopardized.  *See French,* ¶ 24 (noting that we interpret contracts de novo, seeking to effectuate the parties' intent).

¶ 46    Thus, signatories to the Promissory Note and Security Agreement are liable for breaches of these agreements, but CCI also assumed liability as those entities' assign and successor as defined in the contracts.  But we reject Joint Appellants' argument that Pentelute's civil theft, fraudulent transfer, and conspiracy claims are dependent on the alleged breach of contract.  Those claims are independent of the breach of contract claims, and we address them separately below.

### C.    Civil Theft and the Uniform Commercial Code (UCC)

¶ 47    Joint Appellants contend that the district court's civil theft judgment must be reversed.  Joint Appellants argue Pentelute failed to prove that he provided CCI's customers, including CCG, with a UCC creditor letter providing notice of his security interests in the Borrower Entities' accounts receivables; thus, Pentelute did not prove that he had an ownership interest in the property at issue.  They further argue that this also means that Pentelute failed to prove that they "knowingly" deprived him of his property.

¶ 48    Alternatively, Joint Appellants argue that the district court's civil theft findings are "irreconcilably in conflict" because the court found that only Batmann and CCG, not Batenburg, engaged in civil

theft, yet it still entered judgment against Batenburg individually on Pentelute's civil theft claim. Because it is impossible to know which party the court meant to find liable, they contend reversal is required.

¶ 49 Pentelute argues that these contentions were only preserved by CCG, the only Joint Appellant to raise this UCC argument in post-trial motions. And Joint Appellants point to nowhere else in the record where they preserved this issue for appeal, though they argue that "[o]bjections to the court's findings are preserved by C.R.C.P. 52." A party need not take action to preserve objections to the adequacy of the district court's factual findings pursuant to C.R.C.P. 52 for appeal, however. C.R.C.P. 52 ("Neither requests for findings nor objections to findings rendered are necessary for purposes of review."); *see also Rocky Mountain Health Maint. Org., Inc. v. Colo. Dep't of Health Care Pol'y & Fin.*, 54 P.3d 913, 918 (Colo. App. 2001) (For a trial court's findings of fact and conclusions of law to be adequate for purposes of Rule 52, they must be "sufficiently explicit to give an appellate court a clear understanding of the basis of its order.").

¶ 50 Here, Joint Appellants argue that the district court's UCC findings are insufficient, though admittedly, there is a fine line between a new, and unpreserved, legal argument and Joint Appellants' adequacy of the findings argument here. While we conclude the issue has been partially preserved for appeal, C.R.C.P. 52, these contentions are without merit.

¶ 51 The district court addressed two different allegations of civil theft raised by Pentelute. The first involved Batmann, Batenburg, and CCG and their efforts to ensure CCG began paying the Clear brand royalty payments to CCI instead of Batmann and the Borrower Entities; the district court found that "Batmann and CCG engaged in civil theft" as a result. The court noted that "Pentelute issued letters pursuant to [the UCC] to some of CCI's customers demanding that the recipients send the amounts due to any of the Borrower Entities or their successors to Pentelute instead . . . ." Joint Appellants contend Pentelute's issuance of UCC letters to "some of CCI's customers" is insufficient to prove that Pentelute ever sent UCC letters to CCG. But the district court also noted that "Mr. Batenburg acknowledged in his testimony that he had directed

CCG to start paying CCI rather than the Borrower Entities," a finding the record supports.

¶ 52 Batenburg testified that he was the "managing member" of CCG, that he controlled CCG, and that he assigned Batmann and CCG's sublicensing agreement to CCI. As a result, CCG knew of Pentelute's security interest through Batenburg's involvement, so it "knowingly" obtained control over it without authorization, regardless of whether Pentelute issued a UCC letter to CCG. § 18-4-401(1), (1)(a). Additionally, while a creditor "may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party" after a default, the statute does not require a secured party to issue UCC letters to establish a civil theft claim, nor can we find a case that requires as much. § 4-9-607(1)(a).

¶ 53 Joint Appellants go further, however, and argue that a security interest that does not follow the UCC process cannot support a claim for civil theft where the claim is based on UCC remedies. They also argue that Pentelute had to prove that he had an ownership interest in every payment CCG made to CCI. However, these arguments go beyond the adequacy of the district court's civil

29

theft findings and were only raised post-trial. Therefore, these arguments have not been preserved for appeal, and we will not consider them. *See Briargate*, ¶ 66.

¶ 54 Next, Joint Appellants argue that the district court's civil theft findings are irreconcilably inconsistent. Specifically, they point to its finding that "Batmann and CCG engaged in civil theft" after the discussion of the CCG asset transfers to CCI and its rejection of Pentelute's second civil theft claim.

¶ 55 Pentelute's rejected civil theft claim argued "that civil theft occurred by means of fraudulent inducement with respect to Mr. Batenburg's back channel communications with Headspace to implement the CCI enterprise." But Joint Appellants argue that, because the district court rejected this claim, it could not have found (in its findings order) that Batenburg and CCG were liable for civil theft, necessitating reversal because it is impossible to determine what the district court meant. Pentelute argues that the district court's findings do not conflict and that the district court found Batenburg, Batmann, and CCG liable for civil theft.

¶ 56 Because the court's findings order was supported by adequate findings of fact and because we can discern the basis of its

judgment, we reject Joint Appellants' argument. *See Rocky Mountain Health*, 54 P.3d at 918. The district court's most important findings for civil theft included that

> [a]lthough CCG, the Colorado licensee for The Clear, still had a contract with Batmann to pay royalty payments, it voluntarily began paying CCI what it previously had paid to the Borrower Entities. Mr. Batenburg acknowledged in his testimony that he had directed CCG to start paying CCI rather than the Borrower Entities. The court finds that this amounts to knowingly obtaining control over Pentelute's property without authorization, and was done with the specific intent to permanently deprive him of the benefit of the property.

These findings, in essence, highlight that Batenburg committed civil theft by directing Batmann's royalty payments to CCI instead of the Borrower Entities, as discussed above. And when CCG agreed to do this, it was aware of Pentelute's security interest (given Batenburg's involvement). As a result, we conclude that the district court's findings order intended to hold Batmann, Batenburg, and CCG liable for civil theft.

¶ 57    That the district court rejected Pentelute's second civil theft claim against Batenburg does not undermine this result. Batenburg was personally involved in the events that constituted

31

civil theft under in Pentelute's first civil theft claim, and the record supports the district court's findings that Batmann, Batenburg, and CCG committed acts constituting civil theft.  Therefore, we decline to reverse the judgment for inconsistency.

## D.    Fraudulent Transfer

¶ 58    Next, Joint Appellants argue that the district court's fraudulent transfer judgment must be reversed, arguing that its factual findings were insufficient because it failed to individually analyze each party's culpability and that its findings are internally inconsistent.  They also argue that the district court could not have awarded Pentelute the unpaid principal from the Promissory Note because that value is greater than the value of the transferred assets, particularly because the district court ascribed no specific value to the MLA (and if it did, then its rejection of their misappropriation of trade secrets claim conflicts with this value determination).  We agree, in part.

¶ 59    The district court found that Pentelute had advanced fraudulent transfer claims arising under sections 38-8-105 and 38-8-106.  It found that

Batmann exchanged not only the MLA, but its entire ownership interest in [SE], [SR], and Cliintel in exchange for 6 million shares of CCI common stock and majority control the company. These amounted to essentially 100 percent of the assets of the Borrower Entities, including their accounts receivable as to which Pentelute had a perfected security interest at the time.

Based on the value of the Borrower Entities' accounts receivable, the court found that "Batmann was owed $196,717.39, [SE] was owed $657,462.85, [SR] was owed $24,336.57, and Cliintel was due $270,920.00" ($1,149,418.81 total). *Cf. Bertoia v. Denver Gateway LLC*, 2023 COA 76, ¶¶ 36-38 (holding that transferring title to a property may be a cognizable fraudulent transfer claim).

¶ 60    The court found that these transfers were fraudulent under section 38-8-106(1) because Batmann did not receive "reasonably equivalent value" from the illiquid CCI stock it received, and that "Batmann could not pass the liquidity or cash flow test for insolvency." It also found that Batenburg knew that Batmann could not pay its debts as they became due, especially having agreed to the settlement terms. These findings are supported by the record, and Joint Appellants do not contest them; rather, their

fraudulent transfer contentions focus entirely on the court's findings related to section 38-8-105(1)(a).

¶ 61 To that point, the court found that the transfers were fraudulent under section 38-8-105(1)(a) as transfers made "with actual intent to hinder, delay, or defraud any creditor of the debtor." The court specifically made several factual findings concerning Joint Appellants' "actual intent" pursuant to section 38-8-105(2). But, as Joint Appellants point out, the district court entered judgment jointly and severally against all Joint Appellants (Batenburg, Batmann, CCI, SE, SR, Cliintel, CCMG, CCAG IV, and CCG) without individualized intent findings.

¶ 62 Further, Joint Appellants point out that the district court's Amended Final Judgment Order seemingly relied on section 38-8-105(1)(a) when it awarded Pentelute $5,227,444.50 for Joint Appellants' fraudulent transfer, a one-and-one-half-multiplied enhanced damages award (based on the court's underlying breach of contract award of $3,484,963)[5] pursuant to section 38-8-108(1)(c), C.R.S. 2024. But unlike the district court's judgment for

---

[5] We address this baseline calculation in greater detail below in Part V.G.

civil theft — which explicitly authorized enhanced damages pursuant to section 18-4-405 — the district court did not explicitly grant enhanced damages for the fraudulent transfer pursuant to section 38-8-108(1)(c).

¶ 63    The district court's generalized intent findings are not sufficient to convey the basis for its damages award for fraudulent transfer — which depends on finding that each Joint Appellant had the requisite intent under 38-8-105(1)(a) to merit an enhanced damages award pursuant to 38-8-108(1)(c).  *See Rocky Mountain Health*, 54 P.3d at 918.  But, because Joint Appellants do not contest the validity of the district court's fraudulent transfer findings under section 38-8-106, any challenge to this finding is waived.  *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18 ("A basic principle of appellate jurisprudence is that arguments not advanced in the trial court and on appeal are generally deemed waived.")

¶ 64    As a result, we conclude that the district court's finding that Joint Appellants engaged in a fraudulent transfer stand but that it was improper to award enhanced damages pursuant to 38-8-108(1)(c) without the required intent findings for each Joint

Appellant. Accordingly, we remand the case to the district court to determine the appropriate amount of damages for fraudulent transfer, without enhancement, pursuant to section 38-8-109(2), C.R.S. 2024, under which Pentelute may "recover judgment for the value of the asset transferred, as adjusted under subsection (3) . . . or the amount necessary to satisfy the creditor's claim, whichever is less." We decline to address Joint Appellants' contention concerning whether the district court attributed value to the MLA. Whether the MLA had value as it relates to the fraudulent transfer judgment is a question of fact the district court may resolve on remand.

## E.   Civil Conspiracy

¶ 65    Next, Joint Appellants argue that the district court's civil conspiracy findings must be reversed because they were inherently based on the fraudulent transfer as the underlying unlawful act, which it contends must be also reversed. Although we have already rejected this position, they also contend that they cannot be found liable for civil conspiracy because, as a matter of law, "commonly owned affiliates cannot conspire with each other," and Batenburg's involvement with the entities cannot establish a conspiracy because

"corporate employee[s] cannot conspire with the corporations they serve."

¶ 66     Pentelute contends that the issue was not preserved, and Joint Appellants point only to their Rule 59 motions as proof they preserved the issue. We agree that Joint Appellants failed to preserve this issue. *See Briargate*, ¶ 66; *see also Blood*, 224 P.3d at 328-29. And it goes beyond a challenge to the adequacy of the district court's findings. *See People v. Shifrin*, 2014 COA 14, ¶ 90. Accordingly, we may not review this contention for the first time on appeal.

### F.     The Final Amended Judgment's Alterations of the Findings Order's Liability Determinations

¶ 67     Next, Joint Appellants contend that when Judge Luxen issued the Amended Final Judgment Order (the challenged order) he "deviate[d] substantively" from Judge Buchanan's findings order and improperly altered its liability determinations. Specifically, Joint Appellants contend that the district court erred by including the trebled civil theft damages in its civil conspiracy damages calculation and that the challenged order erroneously awarded Pentelute shares in Batmann per the Promissory Note. They also

contend that the district court erred by awarding enhanced fraudulent transfer damages, but we have already addressed this contention above.

¶ 68     The challenged order awarded Pentelute (1) $3,484,963.00 in damages for breach of contract against Joint Appellants with interest, jointly and severally, in addition to "560 Default Shares in Batmann, or an equivalent percentage of Batmann based on a calculation that 750 shares is equal to 35% of Batmann" consistent with the Promissory Note; (2) $5,227,444.50 in damages and interest for fraudulent transfer against all Joint Appellants, jointly and severally; and (3) $10,454,889.00 in damages for civil theft with interest against Batenburg and CCG, jointly and severally. The order also made Joint Appellants jointly and severally liable for civil conspiracy for Pentelute's claims for fraudulent transfer and civil theft (with interest). The court capped Pentelute's maximum recovery for all claims at $10,454,889 (excluding interest, attorney fees, and costs).

¶ 69     First, Joint Appellants contend that the civil conspiracy findings were based solely on the fraudulent transfer because the findings order established that "the unlawful act was the fraudulent

transfer of those assets to CCI." *See Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 502 (Colo. 1989) (one of the elements of a civil conspiracy claim is that defendants commit "one or more unlawful overt acts"). The challenged order awarded damages for civil conspiracy against all Joint Appellants. But Joint Appellants argue that the challenged order could not impose joint and several liability for Pentelute's civil conspiracy claim for all defendants based on civil theft because the findings order only held CCG and Batenburg liable for civil theft and the civil conspiracy claim only concerned the underlying fraudulent transfer.

¶ 70     "In general, '[e]very ruling or order made in the progress of an on-going proceeding may be rescinded or modified during that proceeding upon proper grounds.'" *S. Cross Ranches, LLC v. JBC Agric. Mgmt., LLC,* 2019 COA 58, ¶ 43 (quoting *Broyles v. Fort Lyon Canal Co.,* 695 P.2d 1136, 1144 (Colo. 1985)). The "proper grounds" standard "requires that the trial court's action be within the bounds of discretion." *Id.* at ¶ 44. Because the challenged order made no additional explicit findings, we must "refer to the entire record and to the circumstances surrounding the order" to

resolve any ambiguities. *Blecker v. Kofoed*, 672 P.2d 526, 528 (Colo. 1983).

¶ 71    The findings order supports the conclusion that the civil theft claim could also serve as an unlawful underlying act for Pentelute's civil conspiracy claim. Indeed, the district court noted in its civil conspiracy analysis that "CCG agreed to accomplish the objective [of the conspiracy] by transferring its payments under its sublicense agreement with Batmann and [SE] and [SR] to CCI even though its contractual obligations remained with Batmann and those Borrower Entities." This mirrors the court's civil theft findings. Further, a civil conspiracy can be the result of one or more unlawful acts, and "the essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from the acts done in furtherance of the conspiracy." *Resol. Tr. Corp. v. Heiserman*, 898 P.2d 1049, 1055 (Colo. 1995); *see Jet Courier*, 771 P.2d at 502.

¶ 72    Civil conspiracy is an independent tort and "joint liability shall be imposed on two or more persons who consciously conspire and deliberately pursue a common plan or design to commit a tortious act." § 13-21-111.5(4), C.R.S. 2024; *see also Heiserman*, 898 P.2d at 1055-56 ("[T]he term 'tortious act' encompasses any wrongful act,

other than breach of contract, causing injury or damages . . . .").

Thus, the district court did not abuse its discretion in finding in the challenged order that all parties that conspired to commit civil theft and fraudulent transfer were jointly and severally liable for the corresponding civil conspiracy damages (even if the civil theft damages were trebled). Civil theft was one of the unlawful acts underlying the civil conspiracy, and these findings were sufficiently detailed.

¶ 73 Joint Appellants next argue that the district court could not have awarded Pentelute shares in Batmann, despite the Promissory Note's provision that Pentelute could demand the "immediate" issuance of shares of Batmann stock in the event of a default (the exact number of demandable shares depended on how much the Maker had paid), because the findings order made no such award. But the plain language of the Promissory Note shows that Pentelute is entitled to such an award once he demanded it following a default. The district court did not abuse its discretion by amending the judgment to award these shares based on the parties' contractual obligations. *See S. Cross Ranches*, ¶¶ 43-44.

G.   The Court Erred by Applying Payments Made Under the
Promissory Note to Offset Attorney Fees

¶ 74   Finally, Joint Appellants contend that the district court should

have applied the $646,200 in payments made under the Promissory

Note to offset the principal due under the Promissory Note, rather

than applying the payments to offset Pentelute's attorney fees

award.  We agree, in part, and remand to the district court to give

effect to the requested offset.

1.   Preservation and Waived or Invited Error

¶ 75   Pentelute argues in a single sentence that Joint Appellants did

not preserve this issue.  Alternatively, he suggests that Joint

Appellants waived or invited any error.  We disagree.

¶ 76   Before the April 2023 fees hearings, Joint Appellants objected

to Pentelute's request that the $646,200 in pre-breach payments be

applied towards attorney fees and costs, as opposed to the

Promissory Note's principal.  In their joint motion to amend the

attorney fees judgment, Joint Appellants reiterated this position.  In

a subsequent hearing, Joint Appellants made it clear they believed

"the court should have reduced the principal damage by the

[$]646,000 . . . paid pre-breach."  Alternatively, they asked that the

payments "*at least . . .* be applied to reduce the fee judgment."

(Emphasis added.)  Pentelute contends that raising or accepting

this alternative argument precludes Joint Appellants from claiming

error on appeal.

¶ 77     We must "indulge every reasonable presumption against

waiver" and will not find waiver absent evidence of an "*intentional*

relinquishment of a *known* right or privilege."  *People v. Rediger*,

2018 CO 32, ¶ 39 (citations omitted).  Similarly, we apply the

invited error doctrine narrowly to prevent parties from raising on

appeal errors that they "invited or injected" in the district court.  *Id.*

at ¶ 34.

¶ 78     Joint Appellants' conduct here does not rise to the level of

waived or invited error.  *See City of W. Palm Beach v. Visionair, Inc.*,

199 F. App'x 768, 770 n.1 (11th Cir. 2006) ("The doctrine of invited

error does not preclude parties from making alternative

arguments.").  They consistently maintained their original position,

while asking — at a minimum — that the court reduce some part of

the judgment to account for the pre-breach payments they

completed under the Promissory Note.  We conclude that the issue

was preserved and that neither waived nor invited error precludes our review.

## 2. Analysis

¶ 79    The parties primarily dispute the following language in the Promissory Note concerning the order of application for payments by the Maker (Batmann) to the Holder (Pentelute):

> Any payments made shall be applied first to any reasonable costs advanced or expended by Holder under this Note and any collection costs incurred by Holder in procuring Maker's performance hereunder, then to payment of the interest then accrued and due on the outstanding principal balance hereunder, and the remainder of all such payment shall be applied to the reduction of the *unpaid* principal balance.

(Emphasis added.)

¶ 80    The district court's decision to deduct the $646,200 in pre-breach payments to reduce Pentelute's attorney fees award may have been based on this provision.[6] We conclude that the court should have deducted these payments from the principal and interest due under the Promissory Note — thereby reducing the

---

[6] The court's order does not explicitly state that it relied on the contract language in amending the fees award, but given the parties' fees arguments this is a logical conclusion.

breach of contract damages — rather than the attorney fees award. Read in isolation, the quoted provision lends some support to the district court's ultimate conclusion. However, the Promissory Note as a whole, with the district court's initial findings order, supports Joint Appellants' position that their pre-breach payments should not have been applied to offset Pentelute's attorney fees award. *See Doe*, ¶ 50.

¶ 81  First, the Promissory Note also provides that "*[i]f* from time to time costs or fees are incurred for collection or to defend or enforce any of Holder's rights under this Note, Maker shall pay to Holder upon demand all costs of collection, reasonable attorneys' fees, and court costs and expenses incurred in connection therewith." (Emphasis added). By its plain language, this provision concerns the Holder's *entitlement* to fees and costs for enforcement and/or collection, *if* incurred. *See Quarky*, ¶ 11. The disputed language quoted above, by contrast, governs what happens *when* the Holder incurs fees and costs; namely, any payments made *after* the Holder has incurred such costs must be first applied to those costs and then to the interest and principal.

¶ 82     We read the Promissory Note to mean that when a payment

has been made *before* the Holder has incurred any collection-

related costs or fees, the payment is applied to reduce the principal

and interest due under the Promissory Note.  If no costs or fees

have yet been incurred, payments made under the Promissory Note

cannot logically apply to such costs.  Then, if and when the Holder

incurs such costs or fees, the Holder is entitled to recover them.

Finally, if payments are made under the Promissory Note after the

Holder incurs collection-related expenses, those payments apply

first to costs and fees, then to the interest, and finally to the

principal.

¶ 83     Other parts of the Promissory Note support this interpretation.

For example, interest accrues on "the *unpaid* Principal Sum," and

the "Maker shall make payments of the *Principal Sum and accrued*

*interest* under this note according to the schedule set forth in

Exhibit A."  (Emphasis added.)  The Promissory Note also states

that partial prepayments of principal reduce the "*Principal Sum*,"

not the monthly installments.  (Emphasis added.)  Finally, the

"Default Clause" provides that in the event of a default, additional

interest accrues on the "*outstanding* principal amount . . . at the

rate of ten percent" annually, and the Holder may demand payment of "the entire *unpaid* principal." (Emphasis added.)

¶ 84    The default clause states that any *unpaid* principal due *after* default is subject to a 10% interest rate, not that the entire principal becomes subject to a 10% interest rate upon default regardless of how much of the principal has already been paid. So the Promissory Note does not allow the Holder to reallocate pre-default payment to collection costs or fees, nor does it allow the Holder to apply the default clause to subject the entire principal to an increased interest rate when some of the principal and interest has already been paid.[7] To conclude otherwise would render the Promissory Note's repeated references to "unpaid" or "outstanding" principal meaningless, *see Cook,* 229 P.3d at 1061, and leads to absurd and unintended results, *see Quarky,* ¶ 11.

---

[7] In *Weston v. T & T, LLC,* 271 P.3d 552, 560-61 (Colo. App. 2011), a division of this court considered similar language in a promissory note. There, the promissory note first provided that, upon default, interest would accrue on the "*unpaid principal . . .* from and after the date of any such Default" and stated that the Maker was liable for all costs, expenses, and attorney fees related to collecting on the Promissory Note. *Id.* at 560. The court found that the default interest rate applied only to the unpaid principal and vacated the district court's judgment applying the interest rate to attorney fees and costs. *Id.* at 560-61.

¶ 85    The court awarded Pentelute $3,484,963 in damages for breach of contract. This number correlates with Pentelute's damages calculation, which reflects $2.3 million in unpaid principal (the entire balance of the Promissory Note), $941,084 in interest, and $243,879 in late fees. Pentelute's interest calculation was based on the Promissory Note's increase of the annual interest rate from 5% to 10% in the event of a default. Although the Promissory Note indicates that the 10% post-default interest rate applies to the *outstanding* principal, Pentelute's interest calculation applied to the entire principal amount.[8] Therefore, under the district court's and Pentelute's interpretation, Pentelute was entitled to demand the entire principal amount upon default and not, as the Promissory Note provides, the *unpaid* principal.

¶ 86    This interpretation contradicts the Promissory Note's plain language and leads to an absurd result that penalizes the Maker upon default for the Promissory Note's entire balance, no matter how much it has paid. This would mean that all payments apply to the principal and interest *unless* the Maker defaults and the Holder

---

[8] The $941,084 in interest reflects 40.1% of the total $2.3 million principal, or a 10% yearly interest rate for just over four years.

incurs collection costs and fees, in which case the payments *already* made are retroactively reallocated to the costs of collection, and the entire principal becomes due, subject to the same interest rate as if no payments had been made.

¶ 87    Suppose that the default occurred after making the twenty-third of twenty-four scheduled payments. According to the Promissory Note's loan amortization schedule, this would mean $2,246,086.33 had been paid, with $2,117,847.92 allocated to principal and $128,238.41 allocated to interest. If all other facts remained the same, the judgment would still include $941,084 in interest.[9] So no matter how many pre-breach payments were made, the 10% post-breach interest rate would apply to the entire principal balance. That cannot be what the parties intended.

¶ 88    Applying the pre-breach payment to offset the attorney fees award also contradicts the original judgment in favor of Pentelute in the findings order. The district court's findings order awarded Pentelute "damages in the amount of the *unpaid* payments due

---

[9] This is because the district court's damages award includes interest on the balance of the entire $2.3 million due under the Promissory Note plus a 10% annual interest rate on that balance.

under the [Note], together *with interest* calculated . . . on *each such payment* from the date originally due." (Emphasis added.) We read "unpaid payments" to mean the outstanding principal amount and interest accrued on that amount, not that the amounts already paid should have been applied to offset Pentelute's attorney fees award.

¶ 89 Finally, although the district court accepted Joint Appellants' request to account for the $646,200 in the attorney fees award, applying the payments to offset the attorney fees award does not cure the court's error.

¶ 90 According to Pentelute's calculations from a 2023 motion, applying the pre-breach payments to the principal and interest due under the Promissory Note as of January 31, 2023, resulted in a total remaining balance of $2,508,217. Omitting the pre-breach payments from the calculation increases that amount to $3,434,118. This difference is significantly more than $646,200. Furthermore, the district court used the incorrectly calculated breach of contract damages to calculate the fraudulent transfer and

civil theft damage awards.[10]  So the erroneous interpretation increased all three damages awards.  Reducing the attorney fees award by $646,200 does not correct the court's erroneous damages calculation, which increased the judgment against Joint Appellants by far more than $646,200.  For these reasons, this error was not harmless.  *See* C.R.C.P. 61; *Gebert*, ¶ 30.

¶ 91    We therefore remand for the district court to deduct the pre-breach payments from the principal and interest due on the Promissory Note at the time each payment was made.[11]  Using the correctly calculated remaining balance, we also remand for the district court to correct the damages judgments on each claim accordingly.  We remand for an amendment of the attorney fees award only in light of our conclusion that the $646,200 in pre-

---

[10] The fraudulent transfer and civil theft damages calculations included the incorrectly calculated breach of contract damages, multiplied by one and a half and three, respectively.  Although we conclude the damages multiplier is inapplicable to the fraudulent transfer award in this case, our analysis here remains the same because the court's incorrect breach of contract calculation increased the damages awards for fraudulent transfer and civil theft.

[11] Joint Appellants ask us to apply the pre-breach payments only to the principal; we conclude that the payments should be applied to the principal and accrued interest, in accordance with the amortization schedule, and the Promissory Note's plain language.

breach payment should have been applied to offset damages, not attorney fees. On remand, the court may amend the attorney fees award to reflect the amount originally awarded (before it deducted the pre-breach payments).

## H.    Costs Award and Attorney Fees

¶ 92    Joint Appellants lastly argue that, because we must vacate the judgments in Pentelute's favor, we must also vacate Pentelute's cost award. As we have largely declined to vacate the judgments in Pentelute's favor, we decline to vacate the cost award.

¶ 93    Lastly, Pentelute requests costs and appellate attorney fees, and Tellus requests costs. We address this contention in the related appeal concerning attorney fees in *Pentelute v. Batenburg*, (Colo. App. No. 24CA0137, Dec. 19, 2024) (not published pursuant to C.A.R. 35(e)).

## VI.    Disposition

¶ 94    We affirm the district court's judgments in part but remand the case to the district court to (1) amend the breach of contract judgment concerning the Promissory Note and Security Agreement to hold Batmann, and Batmann, SE, SR, and Cliintel liable to each agreement, respectively, and to hold CCI liable for breaching both

52

agreements as an assign and successor; (2) determine a fraudulent transfer award without enhanced damages in accordance with section 38-8-109(2) and determine the value of the MLA, if any, in the transfer, and; (3) recalculate the base pre-default breach of contract damages award to reflect the payments made per the Promissory Note to the principal and interest before the default and to adjust the damages awards for fraudulent transfer (as necessary), civil theft, and the attorney fees award, accordingly.

JUDGE JOHNSON and JUDGE SCHOCK concur.